**UNITED STATES of America**

v.

**60 28-CAPSULE BOTTLES, MORE OR LESS, and 47 7-Capsule Bottles, more or less, of an article of drug LABELED in part: "UNITROL  *  *  *"**

Civ. A. No. 1061-60.

United States District Court
D. New Jersey.

Sept. 27, 1962.

David M. Satz, Jr., and James D. Butler, Newark, N. J., William E. Brennan, Dept. of Health, Education and Welfare, Washington, D. C., for libellant.

Herbert S. Alterman, Passaic, N. J., Bass & Friend, by Solomon H. Friend, New York City, of counsel, for claimant Nysco Laboratories, Inc.

MEANEY, District Judge.

This action, which arises under the Federal Food, Drug and Cosmetic Act, Title 21 U.S.C. § 301 et seq., was initiated on September 30, 1959 by the filing of a libel of information in the United States District Court for the Eastern District of Michigan. The libel alleged that the Republic Drug Co., Inc., of Buffalo, New York, had shipped in interstate commerce an article of drug labeled in part

"Unitrol—A True Appetite Depressant," from Buffalo, New York, to the Hendrickson Pharmacy, Detroit, Michigan, and that this drug was misbranded within the meaning of Title 21 U.S.C. § 352(a) in that its labeling contained false and misleading statements "which represent and suggest that article is effective as an appetite depressant; and that it will cause one to lose weight without rigid diets; which statements are false and misleading since article is not effective for these purposes."

Pursuant to the libel samples of the allegedly mislabeled drugs were seized at the Hendrickson Pharmacy, along with all related promotional material, specifically a counter display carton and two window banners, which material is to be considered as part of the labeling within the meaning of Title 21 U.S.C. § 321(m).

In addition to the present action approximately a dozen other seizure actions were instituted against the same drug, phenylpropanolamine hydrochloride, hereinafter referred to as PPA, manufactured by the same concern Nysco Laboratories, Inc., Long Island City, New York, and marketed by different retail concerns under a variety of trade names.

The manufacturer, Nysco Laboratories, Inc., upon their motion in the various districts where the seizures were made, was substituted in these actions and these cases, including the instant case, were transferred to the District of New Jersey for disposition. Having chosen this case as being representative, the parties agreed at pretrial to hold the remaining cases in abeyance pending the outcome of the present action.

Also at pretrial the Government was permitted to amend its libel and allege that the seized drug additionally was misbranded in that it claimed in its labeling "that the article is an adequate and effective treatment for obesity * * *." Further, the amendment particularized the language of the labeling to which the Government took exception. Samples of this language read as follows: "LOSE WEIGHT—look and feel lovely * * *

unitrol—A TRUE APPETITE DEPRESSANT—Guaranteed Effective; ONE CAPSULE WORKS ALL DAY— if you want to lose weight * * * curb your appetite the safe, easy Unitrol way—Guaranteed effective; LOSE WEIGHT—UP TO 14 LBS. in 14 DAYS —unitrol * * * that's all—1 capsule works all day."

The issues before the court as defined in the pretrial stipulation and as argued at the trial are:

(a) Whether or not phenylpropanolamine hydrochloride 75 mg. is adequate and effective as an appetite depressant for weight control, or is adequate and effective in the treatment, control or management of obesity.

■ (b) What does the labeling involved in this case represent and suggest?

To take the second issue first the Government contends that the Unitrol labeling represents and suggests that claimant's product is all that is needed to carry out successfully a weight-reducing program. Claimant, on the other hand, argues that what the Unitrol labeling truly represents is that the use of that product along with a reduced caloric intake is all that one need do to lose weight, and points to an 1180 calorie chart that the manufacturer has inserted in each bottle of capsules. Although it is true that the insert states that in order to lose weight caloric intake must be reduced and certain types of food avoided, and although it is also true that by virtue of Title 21 U.S.C. § 321(m) the insert is to be considered as "labeling," it seems nevertheless that a prospective purchaser is given no hint, by the labeling available to him, that he must diet in order to lose weight and that "Unitrol—that's all" is not really all but merely a part of a dietary regimen. The court finds, therefore, that the labeling herein is deceptive in that it fails to inform the public of the nature of the product which it describes until after the product has been purchased.

■ The remaining issue in the case, that of the anorexigenic or weight-reduc-

ing value of PPA, is much more complex than the one discussed above. It confronts the court with the necessity of attempting to evaluate the testimony of the extremely able expert witnesses, which testimony covered pharmacology, physiology and statistical analysis. Because of the importance of this expert testimony to any determination of this case, it is deemed necessary to relate in some detail both the testimony of these witnesses and, as a background to that testimony, the factors that went into the creation of their expertness.

The first witness for the Government was Dr. Joseph F. Fazekas, a physician who is board certified in internal medicine and board qualified in neurology. He has been Medical Officer in Medicine at the District of Columbia General Hospital, and for twelve years was the Chief of Staff of this institution. Doctor Fazekas has taught medicine at the New England Center Hospital, George Washington University Hospital, and Georgetown University Hospital; he has taught pharmacology at the Georgetown University Hospital, and neurology at Tufts Medical School. At present Doctor Fazekas is clinical associate professor in neurology at George Washington University Hospital.

Doctor Fazekas has contributed 204 articles to the medical literature, most of them dealing with metabolic disturbances. He defined metabolic as alterations in the "biological or biochemical activity of various cells under various conditions" and related it to the translation of ingested food into the make-up of the body.

At the request of the Federal Food and Drug Administration Doctor Fazekas designed and supervised an "experiment to determine the therapeutic efficacy of PPA." The test subjects were 81 institutionalized mentally deficient patients whose mental deficiency, that is, low intelligence, was classified as "idiopathic" because it had no known cause. The 81 patients were divided into four groups of approximately 20 each. For six weeks each group was given, one hour before meals, one of the following: A placebo (a medication with no medical but possible psychological effect); 25 mg. PPA three times a day; 50 mg. PPA three times a day; and 5 mg. three times a day of dextro amphetamine, an acknowledged potent anorexigenic agent. The identity and dosage of the administered drugs were unknown to both the subjects and the administrators of the tests. In the study there was no attempt made to restrict food intake and the known caloric diet was at least 3000 calories per day and more was given if requested. The choice of mentally deficient subjects was made in order to eliminate as much as possible the many psychological factors such as the "placebo effect" and the doctor-patient relationship that are known to influence weight reduction in the mentally alert population. Doctor Fazekas testified that idiopathic mentally deficient subjects were valid subjects for his study because in his opinion, "in primary mental deficiency there is no basic disturbance in the hunger and appetite centers * * *."

The "Summary and Conclusions" section of the Fazekas report, as published in the July 1959 issue of the Journal of the American Medical Association, contains the following statement:

"the results failed to demonstrate a significant reduction in weight in the groups of subjects receiving 25 and 50 mg. of phenylpropanolamine three times a day and those given a physically indistinguishable placebo. In the group of subjects receiving 5 mg. of dextro amphetamine three times a day over a similar period of time, there was a statistically significant reduction weight. Although related chemically to dextro amphetamine and retaining certain of its peripheral properties, phenylpropanolamine, as indicated by this study, differs in that it does not possess significant anorexigenic potency."

The testimony of Doctor Fazekas revealed that the conclusion in his report that PPA did not possess significant anorexigenic potency was based upon his

interpretation of a statistical analysis of the total weight changes determined during the study. Doctor Fazekas found that after six weeks the 19 subjects who were given 25 mg. of PPA three times a day had lost an average of 0.86 lb. per person; that the 18 subjects who received 50 mg. of PPA three times a day had lost an average of 0.76 lb.; and that the 21 subjects who received 5 mg. of dextro amphetamine three times a day had lost an average of 4.56 lb. The results of a statistical analysis of the foregoing weight losses, which results are not included in the Fazekas study, led Doctor Fazekas to the conclusion that PPA in the tested dosages had no biologically significant weight-reducing action and therefore it should not be made a part of any dietary regimen.

The second witness for the Government was Dr. Jean Mayer, a nutritionist and physiological chemist who holds the degrees of Bachelor of Letters, Bachelor of Science and Master of Science from the University of Paris, the degree of Doctor of Philosophy in the medical sciences from Yale University, and the degree of Doctor of Science from the Sorbonne. Doctor Mayer is presently an associate professor of nutrition at Harvard University where he teaches at the medical school and the school of public health. He has been a nutrition officer of the United Nations, a consultant in nutrition to the Food and Agriculture Organization and the World Health Organization, and a member of the First International Committee on Protein Requirements and the Second International Committee on Calorie Requirements.

Doctor Mayer has been associate editor of Nutrition Review, nutrition editor of Postgraduate Medicine, and presently he is on the editorial boards of the American Journal of Physiology and the Journal of Applied Physiology. He is also a member of the panel on nutrition of the Committee on the Revision of the United States Pharmacopeia. Doctor Mayer has lectured on nutrition, by invitation, in Canada, Holland, Switzerland, Sweden and Scotland and was vice-president of the International Nutrition Congress held in Amsterdam in 1954. He is a consultant in nutrition at a Boston hospital and continues to advise the United Nations and the Health Departments of Massachusetts, New York, California and New Jersey in nutritional matters. In addition he has published approximately 250 articles on nutrition with a concentration during the past twelve years upon appetite satiety and obesity in experimental animals and in man.

Doctor Mayer testified that he knew of no drug that could be defined as a "true" appetite depressant, which he defined as a substance that "could be used *for long periods of time* to depress appetite and thus treat obesity successfully * * *." (Emphasis added.) He stated that he had found no difference in the reaction to nutritional treatment or drugs between mentally deficient patients and normal subects because the amphetamines, to which class PPA and dextro amphetamine belong, "act at levels of the central nervous system way below those at which differences in mental ability would make a difference." Doctor Mayer further testified that the Fazekas study was "as good a study as any I have ever seen of the efficacy of a given drug in the treatment of obesity" and that it demonstrated to him what he had discovered in his own experience which was that PPA at a dosage level of 75 mg. per day is "not a true specific appetite depressant."

The next witness for the Government was Dr. Arthur Grollman, a physician who is a professor and the chairman of the Department of Experimental Medicine at the Medical School of the University of Texas. He has taught chemistry, physiology and pharmacology at Johns Hopkins University, he has been professor of medicine at the Bowman Gray School of Medicine, and he has been a professor of physiology, pharmacology, biochemistry and medicine at the University of Texas Medical School. Doctor Grollman also has been a Guggenheim Fellow at the Universities of Berlin, London and Heidelberg. He has published

approximately three hundred articles and about a half a dozen text books on medical subjects, specializing in endocrinology, pharmacology and therapeutics, the latter of which is the general use of drugs in the treatment of disease.

Doctor Grollman testified that he had designed many studies to test the pharmacological effect of drugs on humans and that he thought that the method stated in the Fazekas report was sufficient to yield a valid result. He was well acquainted with PPA as he had done some of the early experimental work with this drug before it was sold to the public, and he stated that a mentally deficient patient would react to PPA in the same manner as would a more intelligent person.

Doctor Grollman further testified that although he treats many patients for obesity he has never used PPA because he has learned from medical experience that it is not effective as an appetite depressant nor in the management and control of obesity.

Dr. Thomas H. McGavack, who next testified for the libelant, is a physician and Associate Chief of Staff at the Veterans Administration Center in Martinsburg, West Virginia. He is the Director of the Geriatric Research Laboratories at that institution where he is in charge of a two hundred and thirty-five bed service which cares for older patients. He is also a lecturer in medicine at the George Washington University School of Medicine in Washington, D. C., and at the District of Columbia General Hospital.

Doctor McGavack taught medicine at the University of California Medical School and the New York Medical College, and for fifteen years he was the Director of the New York Medical School Metropolitan Hospital Research Unit where he worked primarily with endocrinal and metabolic diseases. Doctor McGavack, who is on the editorial boards of a number of medical magazines, has published over three hundred articles dealing with drugs and with endocrine and metabolic problems and he has written several medical books, including one on obesity.

Doctor McGavack testified that he has been concerned with the problem of obesity since 1924 and since that time has treated approximately five thousand patients for obesity. He also testified that he and another physician had run a series of tests using "six or eight" drugs to determine their anorexigenic capabilities. He did not use PPA in these tests because he had had many patients who had used it without success and because "we felt that this (PPA) was one of the probably less promising in the field." He stated that PPA would not effect even slight appetite depression in any dosage less than 300 mg. per day, which is well above the recommended "safe" dosage of 75 mg. per day. From his experience and the tests he conducted, Doctor McGavack concluded that there was in his opinion no drug which was effective in the management, treatment and control of obesity solely because of its pharmacological action.

With reference to the Fazekas study, Doctor McGavack expressed the opinion that idiopathic mentally deficient patients were good subjects in a test to measure the pharmacological effect of PPA because the relatively slight effect of that drug on the central nervous system would allow PPA to "express itself" without interference from any activity of the cortex of the brain.

The final medical witness for the Government was Dr. Louis Lasagna, a physician who is an associate professor of medicine, pharmacology and experimental therapeutics at the Johns Hopkins University School of Medicine, and who is the head of the Division of Clinical Pharmacology which is concerned with the evaluation of drugs in man and animals. Before joining the Johns Hopkins faculty as an associate professor in 1954, Doctor Lasagna was associated with Harvard and Boston Universities. He has published approximately sixty-six articles and book chapters mainly dealing with pharmacology in animals and man.

Doctor Lasagna testified that he had participated in the design of "many dozen" clinical studies to test the pharmacological effect of drugs on human beings. He stated that the design of the Fazekas study was a good one and would yield valid scientific results. Doctor Lasagna, who had taught statistics, subjected the Fazekas study to a statistical analysis and determined that "the two-dose (50 mg. three times a day) level for phenylpropanolamine and placebo indicate that the drug does not differ from the placebo at a level of particular significance that is generally considered acceptable in scientific papers."

Doctor Lasagna further testified that the administration of drugs to non-human subjects such as mice, dogs and monkeys will not guarantee a result that can be translated with any degree of certainty to the human system.

The first witness for the claimant was Dr. Frederick Bohensky, a physician practicing medicine in Brooklyn, New York. He teaches internal medicine to resident physicians of the Coney Island Hospital and is a member of the Kings County Health Committee and is a school physician in the New York State School System. Doctor Bohensky has conducted several studies on obesity. One study was conducted for the claimant, after the initiation of the present action, on the effect of PPA on twenty dogs. Another was designed to test the weight-reducing capability of a 900 calorie liquid diet used without a drug. The third involved the action of a drug other than PPA on diabetic, hypertensive and cardiac obese patients. He has published three papers on medical subjects, none dealing with obesity. He treats 150–200 obese patients a year in his practice of internal medicine.

In discussing his study on the twenty dogs, Doctor Bohensky stated that he chose animals in order to eliminate the doctor-patient relationship and particularly chose dogs because he believed that there was a total correlation between the reactions of dogs and human beings to PPA.

Doctor Bohensky was critical of the choice of subjects in the Fazekas study because mental deficiency results from a "deficiency of the central nervous system" and that PPA is a known stimulant of that system. A further criticism that he had was that the subjects would realize that they were being given a drug because of the excitory effect of the amphetamines.

In his study of PPA, Doctor Bohensky used dogs of different age, pedigree and sex and tested them for six weeks—three weeks in a control situation followed by a three-week medication period of $\frac{1}{4}$ mg. PPA per pound of body weight, administered prior to feeding. He found that there was an average weight loss of 21.1% of body weight and that two of the dogs died from what Doctor Bohensky ascribed to be "inanition" which is exhaustion from lack or non-assimilation of food. Another dog developed extreme anorexia, refused to eat and was taken out of the study and given a vitamin injection to stimulate her appetite.

Doctor Bohensky concluded from his experiment that PPA at a dosage of $\frac{1}{4}$ mg. per pound of body weight "is an effective weight reducing agent."

Dr. Theodore M. Feinblatt, also a physician practicing medicine in Brooklyn, New York, was the claimant's other medical witness. He is board qualified in internal medicine and has published more than thirty articles in medical periodicals, of which two dealt with obesity and two with timed disintegration capsules. Doctor Feinblatt and his father, a physician now deceased, designed and executed a study for the purpose of determining for the claimant the safety of the timed disintegration action of Unitrol.

Doctor Feinblatt, discussing the Fazekas report on mentally deficient subjects, stated that in his opinion Doctor Fazekas' study is not applicable to the normal obese person who wishes to lose weight and who is restricted to less than 3000 calories per day. He did state, however, that in a study to test the pharmacological effect of PPA it would be more

scientific to have a normal diet made available to the subjects than to restrict their diet.

In his own study of PPA Doctor Feinblatt testified that he informed his patients that he was giving them something to assist them in losing weight and cautioned them to restrict their caloric intake. Although the results of his study are based on the recorded weights of the thirty patients who completed the eight-week test, fifty to a hundred per cent more than the thirty failed to complete the experiment. He stated that he did not indicate in his report the original number of subjects and the reasons why those that dropped out did so, because his test was designed to test only the toxic effect of the timed disintegration capsule. However, he was of the opinion that his test also indicated that there was anorexiant action in a daily dosage of 75 mg. PPA, because loss of weight is a necessary concomitant of the proper functioning of timed disintegration capsules which contain an appetite suppressant. Doctor Feinblatt found that there was weight loss in all thirty of his subjects at the end of two months and an average loss of "at least 1.7 pounds per week" over that period.

The claimant also offered testimony by a mathematician, Dr. Clifford W. Marshall, who holds a Bachelor of Arts degree, two Master's degrees and a Doctor of Philosophy degree, all of which are in mathematics. He is an assistant professor of mathematics at the Polytechnic Institute of Brooklyn. In addition to eight years of teaching experience, Doctor Marshall was associated for one year with the Institute for Defense Analysis, which is "an operational research group which works with the Joint Chiefs-of-Staff."

At the request of claimant, Doctor Marshall subjected the Fazekas study to a statistical analysis, using a method called the "t" statistic, which he defined as "a statistic which is computable from the statistical data, (and which) makes much more full use of the data than the simple mean. It takes into account the duration and spread of the data." Doctor Marshall stated his opinion that an analysis of data should use as much of the data as possible and not just the mean, which in the Fazekas paper would be the average weight loss per person.

Doctor Marshall computed the "t" statistic based on the mathematical statement that PPA had zero effect on the subjects of the Fazekas study. However, before he made his computation he removed Subject 14 of Table I who had gained 11.5 pounds during the study. Doctor Marshall eliminated the 11.5 pounds gain because he believed that to include this point would "degrade" the analysis. He explained that the reason why he abandoned this figure and yet retained Subject 17 of Table I, indicating a 10 pound weight loss, was because in Subject 14 there was a substantial weight gain during each weekly period, whereas in the other subjects "except for maybe four" there was "some kind of fluctuation taking place." Actually there were eight subjects other than Subject 14 who demonstrated a constant weight gain or loss: Subject 1, Table I; Subject 6, Table II; Subjects 2, 5, 14 and 16, Table III; Subjects 1 and 3, Table IV.

The result of Doctor Marshall's analysis of Table I, minus Subject 14 of Table I, was a slight, *albeit indecisive*, rejection of the hypothesis that PPA had no effect on the subjects of the test.

The second analysis that he made of the Fazekas data was of the premise that there was no difference between the effects of PPA and the placebo. Again the result of the analysis was in the *area of indecision*.

In his third analysis Doctor Marshall, in order to get a larger sampling, used all of the subjects who were given PPA except Subject 14 of Table I, a total of 36. He found that when the larger number of points was used there was a statistical rejection of the hypothesis that PPA had no effect whatsoever.

A fourth analysis determined that the 25 mg. PPA gave the smallest statistical value, the 50 mg. PPA the next largest and the 5 mg. dextro amphetamine the

largest value. No analysis was made of the placebo group.

Doctor Marshall made another analysis based on the assumption that there was no difference in effect between PPA and dextro amphetamine and using only those subjects that demonstrated a loss of weight. He found that this assumption was not rejected but was in the *area of indecision*.

The Government offered a rebuttal witness against Doctor Marshall. He was Mr. William Weiss, Chief of the Paranatal Branch of the Neurological Institute of Disease and Blindness, National Institutes of Health, Washington, D. C. He is the supervisor of a staff of medical statisticians and was formerly the chief statistician of the Food and Drug Administration. Mr. Weiss holds a Bachelor's degree in statistics and has been a practicing statistician since 1948.

Mr. Weiss testified that he would not disregard any of the results of any scientific study and that Subject 14 of Table I was a valid point. He stated that the "t" test was not an appropriate one to use with the Fazekas data because those data are not normally distributed. In a normal distribution, he said, there would be an equal balance between those who gained weight and those who lost weight in the various groups.

Mr. Weiss also testified that he would use a non-parametric or "sign" test in order to circumvent the problem of non-normal distribution. He stated that the non-parametric test gives less weight to the extreme gains and losses than does the parametric or "t" test.

The results obtained from Mr. Weiss' statistical analysis of the Fazekas study, using the "sign" test, indicated that there was no statistical difference between the placebo data and the 75 mg. PPA data, whereas there was a great statistical difference between both of these sets of data and the data of the dextro amphetamine group.

Whatever may be the meaning of "statistical significance," it cannot be equated with biological significance, and in the final analysis it must be the medical evaluation of the statistician's computations that is determinative of the medical value of any drug. Thus the value of statistical evidence without medical interpretation is only cumulative at best in a situation where a biological effect is the subject of inquiry.

In addition to the testimonial evidence relating to the anorexigenic effect of PPA, the claimant introduced a study of this drug that was published in the November 1942 issue of the Journal of the Medical Society of New Jersey. This study was conducted by Dr. S. William Kalb, a physician practicing in New Jersey. The paper indicates that 1880 patients were placed on a high protein diet of from 600 to 1500 calories. 1200 of these patients received 10–20 mg. of amphetamine sulfate twice a day for a minimum of four weeks. 464 of these patients were given ¾ gr. of PPA twice a day for four to sixteen weeks, and for a similar period 216 patients received ⅜ gr. PPA in combination with a drug whose purpose was to counteract the side effects of PPA. Another 100 patients received the low calorie diet without medication. Doctor Kalb concluded from his study that the two above drugs "diminished the appetite in approximately 40 per cent of the 1880 patients with obesity maintained on low caloric diets. In 100 obese patients used as controls, a submaintenance diet alone produced anorexia in only 12 per cent of these."

The published report of the Kalb study does not give the amount of weight lost by the subjects during the test period, nor does it indicate the procedure used in the administration of the study.

■ The burden upon the Government in a misbranding action is that it prove its contention by a fair preponderance of the evidence, United States v. 4 Cases * * * Slim-Mint Chewing Gum, 300 F.2d 144, 148 (7th Cir., 1962). The Government's contention here is that PPA has no significant biological value as a weight-reducing agent. Its proof consists of authoritative opinion and a re-

cently published study on the effects of the drug in a closely controlled situation.

The claimant offers the testimony of two physicians as to their professional experience with PPA and as to the tests conducted by them, one on dogs and the other on office patients. The latter test was designed, according to its creator, solely to determine the safety of a timed release capsule containing PPA. The claimant also offered the 1942 Kalb study on 1880 obese patients and numerous citations from drug encyclopedias to the effect that PPA has an appetite depressant quality.

The dog study of Doctor Bohensky, although it may be persuasive as to the anorexigenic potency of PPA upon dogs, would seem to be only of preliminary value where humans are concerned. Claimant introduced no convincing evidence that the physiological reactions of dogs and humans who had ingested PPA would be the same. Libelant's witnesses strongly contested such a conclusion and their contention seems most probable. The chemical study of Doctor Feinblatt cannot be considered to be a scientific study of the weight-reducing effect of PPA upon human beings, for its author stated that it was designed solely as a test of the safety of the drug and that therefore certain elements necessary for a valid test of its anorexigenic action were omitted from the design.

The study made in 1942 by Doctor Kalb does not provide us with a scientific basis for evaluating it or for comparing its results and method with those of the Fazekas study and the court regrets that Doctor Kalb, who apparently practices medicine here in Newark, N. J., was not called by either side as a witness in order to explain, more fully than they are set forth in the published report, the procedures that he followed and the results that he obtained.

The various pamphlets and articles submitted by the claimant were considered, but their inferences and opinions must yield to the persuasive force of the evidence brought out at the trial.

Claimant contends that the Food and Drug Administration has changed its position as to the appetite depressant effect of PPA and that originally it approved the marketing of the drug as an effective anorexiant. Assuming that this be true, it is also true that the Administration has a duty to change its position with reference to the efficacy of a drug if subsequently it learns that its original position was in error.

An examination of all the evidence presented compels the conclusion that a daily dosage level of 75 mg. PPA has no significant pharmacological value as a weight-reducing agent and that therefore any representation to the effect that PPA in that dosage is an adequate and effective appetite depressant or that it is adequate and effective in the management or control of obesity, would be a misbranding within the meaning of Title 21 U.S.C. § 352(a). The court finds that the labeling of claimant's product Unitrol represents that its sole active ingredient PPA is adequate and effective for the above purposes and consequently that this product is to be condemned according to the provisions of Title 21 U.S.C. § 334(d).

Since the court has considered the biological and physiological effects of PPA, and the general character of the labeling which represents that PPA depresses the appetite with a consequent significant loss of weight, not confining its opinion to the greater claims made by the labeling in the instant case such as a loss of fourteen pounds in fourteen days, it feels that its conclusions are dispositive of all of the cases involving this product which are presently before the court.

This opinion shall serve as findings of fact and conclusions of law.

Let an order be submitted in conformity herewith.