UNITED STATES of America,
Plaintiff-Appellee,

v.

HAMMOND MILLING CO., a corporation, et al., Defendants-Appellants.

No. 26979.

United States Court of Appeals
Fifth Circuit.

July 15, 1969.

Rehearing Denied Aug. 27, 1969.

E. David Rosen, Miami, Fla, for appellants.

William A. Meadows, Jr., U. S. Atty., William A. Daniel, Jr., Asst. U. S. Atty., Miami, Fla., for appellee; William W. Goodrich, Asst. Gen. Counsel, Joanne S. Sisk, Eugene M. Pfeifer, Atty., Dept. of Health, Education and Welfare, Washington, D. C., of counsel.

Before WISDOM and MORGAN, Circuit Judges, and DAVIS,* Judge of the U. S. Court of Claims.

LEWIS R. MORGAN, Circuit Judge.

This is an appeal by Hammond Milling Company and R. H. Hammond, Sr., from a judgment and commitment entered September 13, 1968, in the United States District Court for the Southern District of Florida. The lower Court, after a non-jury trial, determined that both defendants were guilty of violations of Title 21, United States Code, Sections 331(k), 342(a) (3) and 342(a) (4),[1] and fined

---

* Judge Oscar H. Davis, sitting by designation.

1. *Title 21, United States Code, Section 331(k)*:
The following acts and the causing thereof are prohibited:

   *      *      *      *      *

   (k) The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded.

*Title 21, United States Code, Section 342(a)*:
A food shall be deemed to be adulterated—

   (a) (1) If it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injuri-

ous to health; or (2) (A) if it bears or contains any added poisonous or added deleterious substance (other than one which is (i) a pesticide chemical in or on a raw agricultural commodity; (ii) a food additive; or (iii) a color additive) which is unsafe within the meaning of section 346 of this title, or (B) if it is a raw agricultural commodity and it bears or contains a pesticide chemical which is unsafe within the meaning of section 346a(a) of this title, or (C) if it is, or it bears or contains, any food additive which is unsafe within the meaning of section 348 of this title: *Provided,* That where a pesticide chemical has been used in or on a raw agricultural commodity in conformity with an exemption granted or a tolerance prescribed under section 346a of this title and such raw agricultural commodity has been subjected to processing such as canning, cooking, freezing, dehydrating, or milling, the residue of such pesticide chemical remaining in or on such processed food shall, notwithstanding the provisions of sections 346 and 348 of this title, not be deemed unsafe if such residue in or on the raw agricultural commodity has been removed to the extent possible in good

Hammond Milling $2,300.00 and R. H. Hammond, Sr., $200.00. The violations of which defendants were convicted concerned causing lots of bagged lentils and split peas to become adulterated with rodent excretal matter by being kept in a building exposed and accessible to rodents.

The defendants-appellants are Hammond Milling Company, a food processing plant, located in Hialeah, Florida, and R. H. Hammond, Sr., president of the Company. On August 10, 1967, Steven H. Gross, an inspector for the Federal Food and Drug Administration, accompanied by another inspector, went to the premises of the Company for the purpose of making a routine inspection. On arrival, they were referred to Mr. R. H. Hammond, Jr., vice-president, and displayed to him their credentials, served him with a written notice of inspection, and stated they wished to inspect. They did not ask permission, refer to their legal authority to inspect, mention any penalties for failure to allow inspection, raise their voices, restrict his freedom, or threaten in any way; nor did they tell him that he had the right to refuse entry or to have counsel. Their interchanges with him were entirely amicable. He did not refuse or object to their entry, or intimate any reluctance, but he did not explicitly consent or grant permission. Later, Mr. Hammond, Sr., arrived at the plant and made no objection to the inspection. He testified that the Company's premises are inspected approximately three times a year by the United States Food and Drug Administration; however, while he does not know what information is printed on the notice of inspection because he has never read it, he stated that he believed that he was obligated to allow the inspections or be automatically jailed for refusal. This view of the federal law was based on a 1939 circular by a milling trade association. It should be noted that defendants' premises are inspected by city, county, and state inspectors, and no objection is ever made to any of these surveys.

The inspection, which lasted intermittently over a period of four days, disclosed that bags of lentils and split peas, both of which had been in interstate commerce, were adulterated by rodent urine and stored in an area which was unsanitary because rodent excreta pellets, identified as that of mice, were present. The defense on the merits was mainly that the charged contamination resulted from mice which traveled with the bags of lentils and split peas which defendants could not possibly discover, and the ravages of which they were powerless to prevent. To buttress this position, defendants presented a qualified expert, Mr. Kenneth Roberts, whose testimony supported this defense.

■ Prior to the trial, a motion to dismiss was presented to the trial Court which, if successful, would have resulted in suppression of certain evidence. In denying the motion to dismiss, the Court ruled that it was treating that portion of the motion as a motion to suppress. The defendants, citing the *Camara* and *See* cases,[2] contend that the District

manufacturing practice and the concentration of such residue in the processed food when ready to eat is not greater than the tolerance prescribed for the raw agricultural commodity; or (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food; or (4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health; or (5) if it is, in whole or in part, the product of a dis-

eased animal or of an animal which has died otherwise than by slaughter; or (6) if its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health; or (7) if it has been intentionally subjected to radiation, unless the use of the radiation was in conformity with a regulation or exemption in effect pursuant to section 348 of this title.

2. Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930

Court erred in denying their motion to suppress on the premise that no consent was obtained for the inspection. The *Camara* and *See* doctrine, succinctly stated, is that an "administrative entry, *without consent,* upon the portions of commercial premises which are not open to the public may only be compelled through prosecution or physical force within the framework of a warrant procedure." [3] (Emphasis added). The record is lucid and no doubt exists in our minds that consent to survey the plant was given the agents freely and voluntarily under apparently amicable circumstances. That the consent was tacit in nature does not present a difficult problem in that it is quite settled that implied consent is equivalent to expressed consent. In the case of United States v. Crescent-Kelvan Co., 164 F.2d 582 (3 Cir., 1948) the statute under which inspection was to be performed provided for inspection of the premises only after first obtaining permission from the custodian. In determining that consent was actually given, the Court concluded "permission to make such an inspection was implicitly granted to them by the individual defendants then present". The actions of Mr. Hammond, Jr., and Mr. Hammond, Sr., as outlined above, leave no other conclusion but that permission to inspect was impliedly granted.

However, defendants argue that in order for a person to consent intelligently to a warrantless search, he must be aware of his right to refuse to be searched. For authority to sustain this position, the case of United States v. Blalock, 255 F.Supp. 268 (D.C.Pa.,1966) is presented. A reading of this case reveals some crucial distinctions between it and the litigation subjudice. It is a valid rule as expounded in *Blalock,* supra, that one cannot intelligently surrender a right which he does not know he has. However, *Blalock,* supra, was a criminal prosecution for bank robbery and at the time of the search the investigation had attained the accusatory stage. The teachings of United States v. Spomar, 339 F.2d 941 (7 Cir., 1964) set to rest any issue as to the "knowing waiver of rights".[4]

"In sum, we find in this case the Revenue Agents made known to defendant they were investigating his income tax returns and asked to see his records. With this knowledge, defendant voluntarily produced his records for examination by the agents. There was no misrepresentation, fraud, deceit or misconduct on the part of the agents to gain defendant's consent to such examination. At that time, defendant had not been charged with a crime. This examination of defendant's records subsequently formed the basis of the present criminal charges against him.

"Under these circumstances, even though defendant may not have been aware of his constitutional rights above referred to, we hold that his subjective lack of knowledge of such rights did not serve to vitiate the voluntary surrender of his records and did not thereby result in a violation of his right to remain silent and to withhold his private records."

In the case at bar, the defendants had not been charged with a crime at the time of the voluntary consent to the inspection nor had the investigation attained the accusatory stage. Accordingly, we conclude that the defendants need not have been aware of their rights in order to consent to a survey of their premises.

(1967); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).

3. See v. City of Seattle, 387 U.S. 541, at 545, 87 S.Ct. 1737, at 1740, 18 L.Ed.2d 943 (1967).

4. Also see Frohmann v. United States, 380 F.2d 832 (8 Cir., 1967); United States v. Mancuso, 378 F.2d 612 (4 Cir., 1967).

■ As a correlated issue, defendants assert that under the statutory scheme of the Food and Drug Laws a person is coerced into submission to a warrantless search by virtue of the penalties provided for refusal to permit such an inspection.[5] We reject defendants' contention, and a study of their authorities fails to add substance to their argument. This issue appears to have been decided by the United States Supreme Court in See v. City of Seattle, 387 U.S. 541, 87 S. Ct. 1737, 18 L.Ed.2d 943 (1967) when it stated, as is quoted earlier in this opinion, that if consent is not voluntarily given, the prosecution must be advanced within the framework of a warrant procedure.[6] No warrantless search is forced upon an individual or a factory. Under the Act as the law has been elucidated by the Supreme Court in *See,* supra, when consent to inspect is withheld, the agents must then obtain a search warrant under the standard procedure, and it is only after a warrant is procured that an individual or company may be prosecuted for refusing to allow inspection. As the Court summarized in *See,* supra:

"Therefore, appellant may not be prosecuted for exercising his constitutional right to insist that the fire inspector obtain a warrant authorizing entry upon appellant's locked warehouse."

■ In conclusion, defendants allege that their conviction must be set aside because it is impossible for them to comply with the terms of the statute.

Defendants were charged with holding the foodstuffs here involved so that the lentils and split peas were adulterated in two separate ways—the food actually contained filthy substance and the plant's unsanitary conditions may have resulted in contamination of food. The evidence is clear that these violations actually existed. Defendants' witness Mr. Roberts testified that, in his opinion, it is impossible to eliminate rodents from a food plant. However, on further examination, he did concede that it was possible to maintain a plant in such a manner that neither rats nor mice could gain entry.[7] The Government's evidence proved that there was considerable rodent contamination of the lentils and split peas, extensive rodent activity in the plant, several ways in which rodents could enter the building from the outside, and that it was unlikely that the contamination came from a few rodents inside the bags. The above evidence was presented to the trial Court at which time defendants alleged this defense urged on appeal. The trial Court determined that the defendants were guilty as charged, and we are convinced that the evidence is sufficient to support this judgment. Gilliland v. United States, 385 F.2d 912 (5 Cir., 1967). In conclusion, we note that, since the evidence unquestionably proved that the defendants had failed to take all necessary precautions to keep the rodents out, this case does not actually present the issue of whether an individual can be convicted of violating these sections of the Criminal Code when he has done all possible to prevent contamination and unsanitary conditions.

The judgment is affirmed as to all points.

Affirmed.

---

5. Title 21, United States Code, Sections 331(f) and 333(a).

6. See also Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed. 2d 930 (1967).

7. Mr. Roberts—Answer: "Let me correct your statement. Fluorescent lighting has no bearing or effect whatsoever on the doors where rodents could gain entry into the building. If the doors are securely fitted, flush with the floor, keep them down to a minimum of a quarter of an inch where there would be an opening between the surface of the floor and the base of the door, it would be impossible for either rats or mice to gain entry into that building." R. 289-290.