**UNITED STATES of America,
Appellant,**

v.

**ALFRED M. LEWIS, INC., Appellee.**

**No. 24095.**

United States Court of Appeals,
Ninth Circuit.

July 10, 1970.

Certiorari Denied Oct. 26, 1970.
See 91 S.Ct. 120.

Arthur A. Dickerman (argued) Dept. of HEW, Los Angeles, Cal., Robt. S. Linnell, U. S. Atty., Las Vegas, Nev., for appellant.

Raymond E. Sutton (argued) Las Vegas, Nev., Ernest Lopez of Swarner, Fitzgerald & Dougherty, Riverside, Cal., for appellee.

Before BARNES, DUNIWAY and WRIGHT, Circuit Judges.

BARNES, Circuit Judge:

This is an appeal by the Government from an order of the district court suppressing certain evidence which tended to prove that appellee had violated the Federal Food, Drug and Cosmetic Act. 21 U.S.C. §§ 331(k)[1] and 333(a).[2]

---

1. § 331—The following acts and the causing thereof are prohibited:

"(k) The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded."

2. § 333—Penalties:

"(a) Any person who violates any of the provisions of section 331 of this

Jurisdiction below rested on 18 U.S.C. § 3231, and here on 18 U.S.C. § 3731 and 28 U.S.C. §§ 1291 and 1294.

We reverse, and remand the matter for trial.

The trial judge's order for suppression stated only that the cases of See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) and Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), required the obtaining of a search warrant, unless consent to the search was given. The court then, relying on Cipres v. United States, 343 F.2d 95 (9th Cir. 1965), found no consent had been given by appellee.

We hold consent was given, both as a matter of law and fact, and that there was a knowing and informed consent.

In the *Cipres* case, a search of defendant's allegedly locked bags was made at an airport by a United States Customs agent and an officer of the Los Angeles Police Department, without a search warrant, whereupon narcotics were exposed.

Mrs. Cipres was asked if the officers could search the bag; and she replied, "Yes, I have nothing to hide." She also made other statements to the officers. The opinion in *Cipres* states (p. 98):

"A number of circumstances suggest that her assent may have reflected less than a free, deliberate, and unequivocal decision to permit the officers to open the luggage."

These circumstances were: (a) the search was under color of the badge;

(b) Mrs. Cipres asserted that the bags were locked and the keys unavailable ("which on its face would have rendered the consent ineffectual," *id.*); (c) her assertion was accompanied by claims of innocence, and (d) false claims as to the contents of the bags; (e) she asked the officers if they had a search warrant; and (f) at the trial she denied she had ever consented to any search and (g) stated she had asked the officers if they had a search warrant. The officers admitted she had asked them if they had a search warrant.

Because the trial court (said *Cipres, id.*) "apparently" took "a narrow view" of the question of what constituted a waiver, "it did not explore and determine the issue of waiver in the light of these and other circumstances surrounding the arrest." The case was therefore remanded "so that this may be done," and so that the court could also explore other facts that might indicate a search without a warrant was legally permissible. *Cipres* stands for no more than that where a verbal consent is given to a search, the circumstances surrounding such consent must be considered to determine "whether the verbal assent reflected an understanding, uncoerced, and unequivocal election to grant the officers a license which the person knows may be freely and effectively withheld." (*Id.* p. 97)

We turn to the facts of this case. There is no dispute as to these facts, so we adopt the fact statement of the Government's Brief, as appears in the margin.[3]

---

title shall be guilty of a misdemeanor and shall on conviction thereof be subject to imprisonment for not more than one year, or a fine of not more than $1,000, or both such imprisonment and fine; *. * * *"

The foregoing is the statute as it existed on the date of the alleged violation, September 13, 1966, subsequent to the amendment of July 15, 1965 (effective February 1, 1966), and prior to the 1968 amendment (effective October 24, 1968).

**3.** "There is no dispute that evidence of such insanitary conditions was obtained

by a Food and Drug inspector with the permission of defendant's warehouse manager. (Deposition of Riddle, 15 and 24.) * * *

"According to the affidavit of Inspector Chin of the U. S. Food and Drug Administration, he went to defendant's warehouse in Las Vegas on September 13, 1966, at 8:30 a. m. There he identified himself, presented his credentials to the Warehouse Manager, Mr. Rixey Riddle, and stated that he would like to make an inspection of the warehouse. Mr. Riddle readily granted permission to

This consent was not given with any lack of understanding of the purpose of the examination. We again quote from the Government's Brief.[4]

enter and inspect (Vol. 1, 49–50). Inspector Chin's affidavit summarizes what transpired during the inspection (Vol. I, 50):

'During the inspection which extended over a two-day period, I found live insect infestation in and around foods stored in various sections of the warehouse. I showed these conditions to Mr. Riddle from time to time during the inspection.

'Mr. Riddle voluntarily arranged for the destruction of approximately 2700 pounds of various contaminated food items. This destruction was accomplished on September 13–15, 1966, by having an employee of the firm transport the adulterated foods to a city dump where they were disposed of in my presence.'

At the conclusion of the inspection, Mr. Chin gave "Mr. Riddle a written List of Observations describing the insanitary conditions he had found (Vol. 1, 50 and 23).

"Mr. Riddle's deposition confirms the affidavit of Inspector Chin:

"*Pages 15–16*

"Q. Did you give Inspector Chin permission to inspect the warehouse?

"A. Verbally, yes.

"Q. Does your company have a standing policy concerning Federal Food and Drug Inspections and sanitary inspections?

"A. Yes, definitely we do.

"Q. Is this policy embodied in written regulations?

"A. Yes, we have written regulations, you bet.

"Q. As the policy stood at that time, did you follow the regulations?

"A. Absolutely. We have always been told, if I may add, anytime an Inspector comes to our warehouse, I am supposed to greet the man and spend as much time as possible with the. man * * *. Anything that he requests, within reason, within his rules, I am supposed to comply. And, courtesy above all—we have been told that and, anything so far as merchandise that is infested must be destroyed immediately.

"Mr. Riddle agreed that approximately 2700 pounds of bad merchandise were voluntarily destroyed by him (pages 19, 21). Mr. Chin found a number of adulterated food items during his inspection and called them to Mr. Riddle's attention as he went along; these foods had in-

sects in and around them, on the floors and on the shelves (pages 22–23).

"Mr. Riddle also testified that during the inspection he notified his superior, Mr. Williamson, that an inspection was under way because it was company policy to do so (pages 23–24). Far from objecting to such inspections, Mr. Riddle testified that they are helpful [pages 24–25]:

" * * * [T]hese type things are definitely helpful to us because these people have methods and ways of detecting infestation that we don't see. We may go back looking at the same thing as they do, but we might pass it over because their ways are very thorough ways, and in a way, they help us. We don't mind these inspections. They help us. * * * They have given us help as far as knowing how to inspect for things that we might not have gotten if an educated man in that field hadn't been there to tell us that."

"Mr. Riddle readily granted Mr. Chin permission to enter and inspect and at no time objected to the inspection (page 24). Mr. Riddle saw all of the insanitary conditions enumerated in Mr. Chin's written List of Observations and as a result arranged to destroy certain items of merchandise (page 27).

"Mr. Riddle also testified in his deposition that the warehouse in question was a 'cash and carry' warehouse. Customers may go in, wander through the warehouse, select what they want, and use a dolly or truck for that purpose (pages 26–27)." Appellant's Brief, pp. 2–6.

4. " 'On February 18, 1966, a criminal information was filed in the U. S. District Court for the Southern District of California (then at Los Angeles) against Alfred M. Lewis, Inc., and two individuals (the president of the firm and the Northridge warehouse manager) based on insanitary conditions in the Northridge warehouse. (Criminal No. 35830 CD) On March 10, 1966, defendants pled nolo contendere to certain counts. On March 29, 1966, Judge Whelan sentenced the corporation to pay a fine of $1750 and each individual to pay a fine of $250.'

"Within six months after the defendant's conviction in Los Angeles, Inspector Chin found the insanitary conditions at defendant's Las Vegas warehouse which led to the filing of a criminal information in this case (Vol. 1, 49–50, 2–8). When Inspector Chin made this establishment inspection, the Food and Drug

■ It is not disputed that the Federal Food, Drug and Cosmetic Act prohibits the holding of food under unsanitary conditions, whereby adulteration may take place, while the food is held for sale after shipment in interstate commerce. 21 U.S.C. §§ 331(k) and 342(a) (3) (4). United States v. Wiesenfeld Warehouse Co., 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed.2d 536 (1964).

Inspection of food warehouses is a necessary incident to such holding of food. Inspections are authorized under 21 U.S.C. § 374(a), (d) under certain specified conditions. It is undisputed this inspection was carried out in accord with the letter and spirit of the statute. Thus it was at a "reasonable time," and both "credentials" and a "written notice" were presented by Mr. Chin to Mr. Riddle, the warehouse manager. Permission to inspect was granted by Mr. Riddle, not only without limitation or condition, but whole-heartedly and with Mr. Riddle's full and active cooperation, as authorized by his employer, and as instructed by that employer. "It was at a reasonable time and within reasonable limits and in a reasonable manner."

■ We cannot imagine a clearer factual case of the giving of a consent to an inspection which reflected an understanding (uncoerced and unequivocal) that the warehouse owners knew their rights and gladly cooperated in such inspection.

We need not determine if there will eventually be a line drawn between inspection of homes and/or locked places of business and the facts of this case, where the "cash and carry" warehouse was open to walk-in customers. See stated: "We do not in any way imply that business premises may not reasonably be inspected in many more situations than private homes." See v. City of Seattle, *supra*, 387 U.S. at 545–546, 87 S.Ct. at 1740. More recently the Supreme Court in Colonnade Catering Corp. v. United States, 397 U.S. 72, 76–

77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970) said with respect to liquor laws:

"We agree that Congress has broad power to design such powers of inspection * * * as it deems necessary to meet the evils at hand. * * * As respects [the liquor] industry and its various branches, including retailers, Congress has broad authority to fashion standards of reasonableness for searches and seizures."

Chief Justice Burger, in his *Colonnade* dissent, says, "The majority sees no constitutional violation; I agree", *id*. at 78, 90 S.Ct. at 777; and with respect to the lack of any necessity for a warrant when the business is one open to the public (as is the case here), he states:

"The government agents needed neither a warrant nor these statutes to secure entry to this place of business since it was as open as any business establishment that seeks to sell goods and services to the public. The agents need to rely on the statutes only to carry out their duty to inspect after accomplishing entry. This was recognized implicitly by Congress in limiting the inspection to 'business hours' and daytime. Congress went beyond mere entry; it provided for *inspection*. Inspection authorization would be meaningless if the agents could not open lockers, cabinets, closets, and storerooms and indeed pry open cases of liquor to see the contents." (*Id*.)

The "search", or more properly "inspection", in this case occurred on September 13, 1966. The *See* and *Camara* cases, cited *supra*, were decided June 5, 1967. The trial judge held them retroactive. Both cases relate to the exclusion of evidence. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), establishing an exclusionary rule as to evidence unlawfully searched for and seized, was held non-retroactive in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

Administration had no advance information that insanitary conditions existed at

this warehouse (Vol. 1, 55)." Appellant's Brief, pp. 7–8.

Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), with respect to the waiver of constitutional rights was held not retroactive because of Halliday v. United States, 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16 (1969), which held that three factors must be referred to in determining the retroactivity of any decision: (1) the purpose of the new rule, (2) the extent of reliance on the old rule, and (3) the effect of retroactive application on the administration of justice.

Assuming that *See* and *Camara* accomplish a change in the law as to the right to search in FDA cases, and if we assume arguendo that the search in this case was rendered unreasonable under the new rule, still that was not the rule at the time the search took place. The search at that time was therefore not unreasonable *Cf.* discussion in Meadows v. United States, 420 F.2d 795 (9th Cir.1969).

Defendant cites and relies upon United States v. J. B. Kramer Grocery Co., 294 F.Supp. 65 (E.D.Ark. 1969), a post-*Camara* case. There the district court held there had been no consent to inspect, but went on to say it was not holding "that warrantless inspection of business premises by inspectors of FDA are unconstitutional per se; such inspections would appear to be perfectly valid assuming actual voluntary consents." *Id.* at 70. Since argument, the district court was affirmed. 418 F.2d 987 (8th Cir. 1969).

Finally, in United States v. Hammond Milling Co., 413 F.2d 608 (5th Cir. 1969), cert. denied, 396 U.S. 1002, 90 S.Ct. 552, 24 L.Ed.2d 494 (1970), consent to an inspection such as here occurred was held to have been validly given, though not actually expressed. In *Hammond*, the corporate officers made no objection to and intimated no reluctance toward such an inspection. There the Fifth Circuit panel distinguished United States v. Blalock, 255 F.Supp. 268 (E.D. Pa. 1966), which held that one cannot intelligently surrender a right which he does not know he has. Agreeing with the soundness of that principle, the *Hammond* opinion points out that in the *Blalock* bank robbery case the search was at a time that the investigation had reached the accusatory stage. They then relied upon the teachings of United States v. Spomar, 339 F.2d 941 (7th Cir. 1964), to set to rest any issue as to the "knowing waiver of rights." In summation, the *Hammond* panel said:

"In the case at bar, the defendants had not been charged with a crime at the time of their voluntary consent to the inspection nor had the investigation attained the accusatory stage. Accordingly, we conclude that the defendants need not have been aware of their rights in order to consent to a survey of the premises." (413 F.2d at 611.)

This circuit has approved the same rule, where there had been voluntary presentation of evidence to revenue agents, with no stealth, trickery, fraud or misrepresentation involved on their part, where defendant was without counsel, and where the defendant had not been warned of his rights. Kohatsu v. United States, 351 F.2d 898 (9 Cir. 1965), cert. denied, 384 U.S. 1011, 86 S. Ct. 1915, 16 L.Ed.2d 1017 (1966).

In this connection we note with approval United States v. Thriftimart, et al., 9 Cir., 429 F.2d 1006, decided by a panel of this court on July 7, 1970, wherein the distinction between an administrative search and a criminal search is made. Here, of course, there was an administrative search similar to that in *Thriftimart*.

We reverse the order suppressing evidence and remand for further proceedings in the trial court.