UNITED STATES of America, Plaintiff,

v.

AN ARTICLE OF FOOD CONSISTING OF 12 BARRELS, MORE OR LESS, LABELED IN PART: (BARREL) LUMPFISH ROE 100 KG NET COLORED BLACK, Defendant.

No. 78 Civ. 3090–CLB.

United States District Court,
S. D. New York.

Sept. 28, 1979.

Asst. U. S. Atty., New York City, for plaintiff.

Arnold J. Kaplan, New York City, for defendant.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

Plaintiff in this action, the United States of America, seized 12 barrels of lumpfish roe, referred to during the trial as "caviar," pursuant to the provisions of the Federal Food, Drug and Cosmetic Act (hereinafter "the Act"), 21 U.S.C. § 334. The complaint, filed July 10, 1978, alleges that the seized lumpfish roe constitutes an adulterated food held for sale after shipment in interstate commerce within the meaning of the Act, 21 U.S.C. § 342(c), in that it bears and contains a color additive, FD&C Red No. 2 (hereinafter "Red # 2"). Iranian Caviar and Sturgeon Corporation (hereinafter "claimant" or "Iranian Caviar Corp.") intervened in the action and filed a claim to the seized lumpfish roe. The case was tried before me without a jury on June 15 and July 3, 1979.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355 and 21 U.S.C. § 334.

The Iranian Caviar Corp. processes and distributes lumpfish roe for sale to delicatessens and others. On July 10, 1977 it received a shipment of 20 barrels of lumpfish roe. This shipment was first transported from Bergen, Norway to the United States, arriving July 4, 1977. The 20 barrels were then moved from Newark, New Jersey to Edison, New Jersey and finally to New York City, where they remained in refrigerated storage for approximately one year at the premises of Iranian Caviar Corp. in this District.

On May 5, 1978, a Food and Drug Administration (hereinafter "FDA") inspector entered the Iranian Caviar Corp.'s premises for the purpose of conducting a scheduled routine inspection. While inspecting the plant, the inspector discovered a container labelled "Black Shade," which listed several

Robert B. Fiske, Jr., U. S. Atty., Southern District of New York by Kent T. Stauffer,

ingredients, including Red # 2. The inspector also discovered several large wooden barrels in a refrigerator that were marked in part " * * * LUMPFISH ROE 100 KG NET * * *." Affixed to a number of these barrels were white tags with the words "colored black" and a date. Samples were taken from five of these barrels, and photographs were taken of the container labelled "Black Shade" and also the barrels with white tags.

Although it is unclear from the testimony at trial, FDA chemists apparently discerned the presence of Red # 2 in the samples taken from the five wooden barrels and the "Black Shade" container. On the basis of this analysis, the FDA obtained a warrant from the Clerk of this Court for the arrest of 12 barrels labelled in part " * * * LUMPFISH ROE 100 KG NET * * * COLORED BLACK * * *," pursuant to Rule C of the Supplemental Rules for Admiralty and Maritime Claims. See 28 U.S.C. § 2461(b) and 21 U.S.C. § 334(b). They also obtained a warrant for inspection of the Iranian Caviar Corp.'s premises. The warrant for inspection was issued on July 17, 1978 after submission of papers regular on their face filed by FDA Agent Ellen Herr. On the same day, an FDA agent and two United States Marshals "seized" 12 barrels containing lumpfish roe in an Iranian Caviar Corp. refrigerator. They did so by attaching the arrest warrant to one of the barrels. Nine days later, on July 26th, the agent and marshals returned with a truckman to remove the barrels that they had seized. The arrest warrant was no longer attached to any of the barrels, and there was some confusion over which barrels to remove. As a result, a number of barrels were opened, and the FDA agent identified those that were colored and those that were not. In all, 12 barrels of lumpfish roe were removed to the Merchant's Refrigerating Company, a private warehouse company which stored the roe on behalf of the United States Marshal of this District.

A second analysis of the 12 seized barrels was performed at the request of claimant by Fitelson Laboratories, Inc., a private testing laboratory. On November 9, 1978,

samples were taken from three of the twelve barrels, and Red # 2 was found to be present in all three. The nine remaining barrels were sampled by Fitelson Laboratories on March 1, 1979, and Red # 2 was discerned in eight of the nine barrels.

The Government brings this action under § 304(a) of the Act, as amended, 21 U.S.C. § 334(a)(1), which provides in pertinent part:

"Any article of food . . . that is adulterated or misbranded when introduced into or while in interstate commerce or while held for sale (whether or not the first sale) after shipment in interstate commerce . . . shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States or United States court of a Territory within the jurisdiction of which the article is found."

■ Therefore, to establish a *prima facie* case that this section was violated, the Government must prove by a preponderance of the evidence that the lumpfish roe contained in the 12 seized barrels was "food" that travelled in "interstate commerce," and that this food was "adulterated" when introduced into, while in, or while held for sale after, shipment in interstate commerce. See, *United States v. 449 Cases, containing "Tomato Paste,"* 212 F.2d 567 (2d Cir. 1954).

■ For purposes of the Act, food is defined in part in 21 U.S.C. § 321(f) as "articles used for food or drink for man or other animals." The lumpfish roe involved here falls within this definition, and testimony of claimant's principal officer concedes that this lumpfish roe was food intended to be sold as a caviar substitute. (Tr. 7/3/79, pp. 9–10). Therefore I find that the 12 barrels seized in this case contained food within the meaning of the Act.

■ Interstate commerce is defined by the Act as, *inter alia*, "commerce between any state or territory and any place outside

thereof." 21 U.S.C. § 321(b). The 12 barrels sought to be condemned were shipped from Norway to the United States, and after clearing customs in New Jersey, were transported into New York. In New York, the lumpfish roe was being held by the Iranian Caviar Corp. pending its eventual sale in the United States or Canada. These facts are undisputed (Tr. 7/3/79, pp. 7–10), and therefore I find that the 12 barrels were held for sale after shipment in interstate commerce, as defined by the Act.

■ The remaining question is whether the lumpfish roe was adulterated before, during or after shipment in interstate commerce. 21 U.S.C. § 342(c) provides that "[a] food shall be deemed adulterated [under the Act] if it . . . bears or contains a color additive which is unsafe within the meaning of § 376(a) of this title." 21 U.S.C. § 376(a) provides in relevant part:

"A color additive shall, with respect to any particular use (for which it is being used or intended to be used or is represented as suitable) in or on food . . . be deemed unsafe for the purposes of the application of section 342(c) . . . of this title . . . unless—

(1)(A) there is in effect, and such additive and such use are in conformity with, a regulation issued under subsection (b) of this section listing such additive for such use, including any provision of such regulation prescribing the conditions under which such additive may be safely used, and (B) such additive either (i) is from a batch certified, in accordance with regulations issued pursuant to subsection (c) of this section, for such use, or (ii) has, with respect to such use, been exempted by the Secretary from the requirement of certification."

Thus a color additive is unsafe unless a regulation promulgated by the FDA permits its use. The FDA specifically found Red # 2 to be unsafe in 1976 and banned its use, 41 Fed.Reg. 5823 (Feb. 10, 1976), and that finding has been upheld in subsequent litigation. See, *Certified Color Manufacturers Ass'n v. Matthews*, 543 F.2d 284 (D.C.Cir.1976). In addition a review of the current FDA regulations relating to color additives indicates that the status of Red # 2 has not changed. 21 C.F.R. §§ 23.1–82.2050.

The evidence offered at trial clearly indicates that 11 of the 12 barrels involved in this case contained Red # 2. Tests by the FDA and a qualified private chemist came to this conclusion, and there is no evidence to refute it. It follows that the food was adulterated within the meaning of 21 U.S.C. §§ 342 and 376, and therefore I find that the Government established a *prima facie* case for condemnation, and that the 11 barrels of lumpfish roe that contained Red # 2 were properly seized under 21 U.S.C. § 334(a)(1).

■ Claimant asserted a number of theories during the trial as possible defenses to the Government's case. First, claimant implied that the lumpfish roe was adulterated or dyed by some mysterious stranger without its knowledge. This contention, if established, would not affect the validity of the Government's seizure nor its right to condemn. The Act only requires that the food be adulterated; it does not require proof of how the food was adulterated. 21 U.S.C. § 334(a)(1). However, the issue of whether the Iranian Caviar Corp. in fact put the Red # 2 in the lumpfish roe is important in another respect. Title 21 U.S.C. § 334(d)(1), which directs that any food condemned under § 334 be disposed of by destruction or sale, includes the following:

"If the article was imported into the United States and the person seeking its release establishes (A) that the adulteration . . . did not occur after the article was imported, and (B) that he had no cause for believing that it was adulterated . . . before it was released from customs custody, the court may permit the article to be delivered to the owner for exportation in lieu of destruction upon a showing by the owner that all of the conditions of section 381(d) of this title can be and will be met."

Therefore, claimant's expression of the theory that another party adulterated the

lumpfish roe was asserted indirectly to provide a basis for the return of the caviar for exportation in lieu of destruction.

■ This point is of more than academic interest. While Red # 2 has been finally determined by the appropriate federal bureaucrats to be a dangerous carcinogen, the use of which in food is absolutely prohibited, it seems that in Canada its use remains both lawful and commonplace. Whether there is a physiological difference of some sort between Canadians and Americans rendering the former less susceptible to cancer, or whether there is merely a difference in bureaucrats between the two countries is a question which need not be resolved here. The evidence at the trial justifies an inference, and I find, that an officer or employee of claimant Iranian Caviar Corp. colored the lumpfish roe right here in New York, and that the dye used for coloring included Red # 2. An FDA inspector testified, and I find, that Mr. Ura Fridman, President of the Iranian Caviar Corp., admitted to coloring the lumpfish roe with a dye. (Tr. 6/15/79, pp. 119–20). Mr. Fridman, in his testimony, denied any knowledge of Red # 2, but did admit that his firm colored the roe with a "black jet color." (Tr. 6/15/79, pp. 9–10). Furthermore, pictures of tags on the barrels of lumpfish roe in the Iranian Caviar Corp.'s refrigerator reveal that the roe was "colored black" in August, 1977, after the barrels were received by claimant. (PX 8). This evidence, coupled with the fact that a container of black food coloring containing Red # 2 was found on the premises, leads to the conclusion that the Red # 2 was in the dye used by claimant to color the roe. Claimant offered no credible evidence to oppose this inference, and I conclude that the Government has proved, by a fair preponderance of the evidence, that the adulteration did occur after the lumpfish roe was imported. Therefore, 21 U.S.C. § 334(d)(1) does not apply, and the 11 barrels properly seized by the Government should not be returned to claimant for exportation.

■ Claimant also charged at the trial that the actions of the Government agents leading up to the removal of the lumpfish roe constituted an unreasonable search and seizure, presumably in violation of the Fourth Amendment to the United States Constitution. This theory appears to be based on the assertion that the FDA inspector who originally sampled the roe had no authority to inspect the Iranian Caviar Corp. premises, and that the FDA agent and U.S. Marshals participating in the seizure of the 12 barrels were unnecessarily abusive and used undue physical force (Tr. 7/3/79, pp. 27, 32–34). I find no merit in these charges, either factually or in law. The FDA inspector testified, and I find that he was on a regularly scheduled visit. Mr. Fridman admitted in his testimony to having permitted such an inspection in his presence without reservation or objection (Tr. 7/3/79, p. 11). Claimant presented no credible contrary evidence, and I conclude that the inspection was not an unreasonable search. See, *United States v. Hammond Milling Co.*, 413 F.2d 608 (5th Cir. 1969), *cert. denied* 396 U.S. 1002, 90 S.Ct. 552, 24 L.Ed.2d 494 (1970). As for the events leading up to the subsequent second seizure and removal of the barrels, the testimony of the FDA agent and the Deputy United States Marshal shows, and I find, that their conduct was proper and that it was Mr. Fridman who was impeding their official duties by his actions and by refusing to cooperate. (Tr. 6/15/79, pp. 65, 67, 69, 77; PXs 12, 15). It is undisputed that the seizure took place during daylight hours, and that the agents and marshals had procured a warrant for the arrest of the barrels and a warrant to inspect the premises. While the Government concedes that claimant's lock on its refrigerator was broken in order to remove the 12 barrels, this action was only taken after a search warrant was issued, and after Mr. Fridman refused to unlock the door. Claimant has failed to prove that the Government's conduct was improper. See *Founding Church of Scientology v. United States*, 409 F.2d 1146 (D.C.Cir.), *cert. denied* 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969).

Moreover, I conclude that the exclusionary rule applied to evidence seized in violation of the Fourth Amendment does not apply to condemnation proceedings under 21 U.S.C. § 334. See, *Founding Church of Scientology v. United States, supra,* at 1149–50. The Court of Appeals in *United States v. Articles of Hazardous Substance,* 588 F.2d 39 (4th Cir. 1978) held that adherence with the Admiralty Procedure prescribed in Supplemental Rule C of the Federal Rules of Civil Procedure provides sufficient probable cause for the issuance of a warrant of seizure. Supplemental Rule C provides that the clerk of the district court "shall" issue a warrant for the arrest of an article of food under 21 U.S.C. § 334 on the basis of a complaint verified on oath or by affirmation. In addition, it is well established that contraband, though unlawfully found or seized in violation of the Fourth Amendment, and therefore suppressed as evidence in criminal proceedings against the owner or possessor, may be condemned by the Government and will not be returned. This is so even if the granting of a suppression motion bars the underlying criminal prosecution. *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *United States v. One 1971 Harley Davidson,* 508 F.2d 351 (9th Cir. 1974); *United States v. Deane Hill Country Club, Inc.,* 342 F.2d 794 (6th Cir.), *cert. denied* 381 U.S. 937, 85 S.Ct. 1769, 14 L.Ed.2d 701 (1965). The rationale for this latter rule is that returning the contraband would frustrate "the express public policy against the possession of such objects." *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 699, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965). Accordingly, the exclusionary rule fashioned by the courts to protect the Fourth Amendment rights of individuals is not available to a claimant in a condemnation proceeding brought *in rem* concerning the contraband itself. Such a condemnation can be maintained so long as the initial pre-seizure requirements of Supplemental Rule C, *supra,* have been met by the Government. Claimant would not be entitled to the return of the 12 barrels of lumpfish roe found to be contaminated even if it had proved that these articles were illegally seized. *United States v. Jeffers, supra.* It is arguable that the contamination of the lumpfish roe might not have been established if the exclusionary rule, applicable to the prosecution of crimes were applied in this civil *in rem* action, and the barrels themselves were suppressed before trial as fruits of an improper search or seizure. However, such an argument ignores the express public policy against the possession of contraband, *One 1958 Plymouth Sedan v. Pennsylvania, supra.*

The exclusionary rules are judge-made law promulgated beginning with *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) as a result of a perceived necessity for the courts to "deter" those charged with enforcement of the criminal laws from violating the Constitutional rights of persons. The controversy resulting was immediate and forceful, becoming more strident when the Supreme Court in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) extended the rule to those states, including New York, which had not imposed it. Whether the "deterrence" was effective, or worth the price paid, we leave to others. More than fifty years ago Judge Cardozo, speaking for the New York Court of Appeals, observed (*People v. Defore,* 242 N.Y. 13, 19–23, 150 N.E. 585, 586–589 (1926):

> "The officer [effecting an illegal search] might have been resisted, or sued for damages, or even prosecuted for oppression. [Citation omitted]. He was subject to removal or other discipline at the hands of his superiors. These consequences are undisputed. The defendant would add another. We must determine whether evidence of criminality, procured by an act of trespass, is to be rejected as incompetent for the misconduct of the trespasser.

> The question is not a new one. It was put to us more than 20 years ago in *People v. Adams,* 176 N.Y. 351, 68 N.E. 636 and there deliberately answered. * * On appeal to the Supreme Court, the judgment was affirmed *Adams v. N. Y.,* 192 U.S. 585, 24 S.Ct. 372, 48 L.Ed. 575.

. . . . It is at variance, however, with later judgments of the Supreme Court of the United States. * * * This means that the Supreme Court has overruled its own judgment in *Adams* . . . . There has been no blinking the consequences. The criminal is to go free because the constable has blundered.

\* \* \* \* \* \*

[W]e reflect how far-reaching in its effect upon society the new consequences would be. The pettiest peace officer would have it in his power, through overzeal or indiscretion, to confer immunity upon an offender for crimes the most flagitious. A room is searched against the law, and the body of a murdered man is found. If the place of discovery may not be proved, the other circumstances may be insufficient to connect the defendant with the crime. The privacy of the home has been infringed, and the murderer goes free. Another search, once more against the law, discloses counterfeit money or the implements of forgery. The absence of a warrant means the freedom of the forger. Like instances can be multiplied. We may not subject society to these dangers until the Legislature has spoken with a clearer voice. In so holding, we are not unmindful of the argument, that, unless the evidence is excluded, the statute becomes a form and its protection an illusion. This has a strange sound when the immunity is viewed in the light of its origin and history. The rule now embodied in the [state civil rights] statute was received into English law as the outcome of the prosecution of Wilkes and Entick (*People v. Chiagles*, 237 N.Y. 193, 142 N.E. 583). Wilkes sued the messengers who had ransacked his papers, and recovered a verdict of £4,000 against one and £1,000 against the other. Entick, too, had a substantial verdict (*Boyd v. U. S.*, 116 U.S. 616, at p. 626, 29 L.Ed. 746; *Entick v. Carrington*, 19 Howell State Trials, 1030; Fraenkel, Concerning Searches & Seizures, 34 Harv. L.R. 363, 364, and cases cited). We do not know whether the public, represented by its juries, is today more indifferent to its liberties than it was when the immunity was born. If so, the change of sentiment without more does not work a change of remedy. Other sanctions, penal and disciplinary, supplementing the right to damages, have already been enumerated. No doubt the protection of the statute would be greater from the point of view of the individual whose privacy had been invaded if the government were required to ignore what it had learned through the invasion. The question is whether protection for the individual would not be gained at a disproportionate loss of protection for society. On the one side is the social need that crime shall be repressed. On the other, the social need that law shall not be flouted by the insolence of office. There are dangers in any choice. The rule of the *Adams* case strikes a balance between opposing interests."

His observations ring true today. Bound as we are by the policy decision made in *Weeks* and its progeny, we must continue to let the criminal go free where the constable has blundered. But claimant would ask the courts, solely in order to vindicate Fourth Amendment rights, secured to *persons* under the Constitution, also to turn loose into the byways of commerce contaminated food for consumption by the unsuspecting public. Why? This poisoned carcinogenic caviar has no rights. If Mr. Fridman's rights, or those of claimant were infringed, they have the adequate remedies envisioned by Judge Cardozo. The Court declines to extend the exclusionary rule to the benefit of inanimate dangerous articles, or to protect the profits which flow from the sale of contraband.

Claimant's assertion that the barrels of lumpfish roe were seized unreasonably in violation of the Fourth Amendment would, if proved, be insufficient as a matter of law to justify or compel release of the caviar for human consumption.

Accordingly, the defendant *in rem* articles of food are condemned and forfeited to the Government with the exception of the

single barrel from which the sample lettered "C" was taken by Fitelson Laboratories. Costs in this action are awarded against claimant, in accordance with 21 U.S.C. § 334(e). The foregoing constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 52, F.R.Civ.P.