**UNITED STATES of America, Plaintiff,**

v.

**789 CASES, MORE OR LESS, OF LATEX SURGEONS' GLOVES, AN ARTICLE OF DEVICE, etc., Defendant.**

**Claim of Plastic Materials of Puerto Rico, Inc.**

**Civ. No. 90–1777 (JP).**

United States District Court, D. Puerto Rico.

Aug. 20, 1992.

Silvia L. Carreño–Coll, Annamarie Kempic, Asst. U.S. Attys., Hato Rey, P.R., for plaintiff.

Harry Anduze Montaño, Hato Rey, P.R., for claimant.

OPINION AND ORDER

PIERAS, District Judge.

This is an *in rem* forfeiture action brought by the plaintiff, United States of America ("plaintiff"), pursuant to the Federal Food, Drug, and Cosmetic Act (the "Act"), 21 U.S.C. § 301 *et seq.* The requisite Initial Scheduling Conference and Pretrial Conference were held, and a Non–Jury Trial was conducted on September 3—13, 1991; February 13—14, 1991; March 30—31, 1991; and April 3, 1992.

Based on the evidence presented by the parties and after due deliberation, this Court now makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Claimant, Plastic Materials of Puerto Rico, Inc., ("Plastic Materials" or "claimant"), manufactured the seized articles at a building in Loiza, Puerto Rico, (manufacturing facility), and stored certain of the seized articles, device components and accessories as well as finished product, at a warehouse in Luquillo, Puerto Rico. Cox Testimony, day 1, p. 16, 17, 31–44, 65, 104. *See also* P. González Testimony, day 11, p. 35–36.

2. Plastic Materials' represented that its gloves were to be used as surgeons gloves or as dental examination gloves. Cox Testimony, day 1, p. 21–22; Exhibits [1] 4, 5; P. González Testimony, day 11, p. 33, day 13, p. 120–121.

3. Plastic Materials' only customer for the seized articles was the United States Department of Defense. Testimony of Harold Gordon Cox (Cox Testimony), day 1 p. 21; Testimony of Peter González Díaz, day 11, p. 33, day 13, p. 120–121; Exhibits Y2, Z2, A3, and T7.

4. The Department of Defense purchased only latex surgeons and dental examination gloves from Plastic Materials. P. González Testimony, day 13, p. 121, Exhibits Y2, Z2, A3, and T7.

5. Plastic Materials is a manufacturer of medical devices. Cox Testimony, day 1, p. 20–21; P. González Testimony, day 11, p. 33, day 13, p. 121.

6. Plastic Materials manufactured the seized latex surgeons gloves and latex examination gloves. Cox Testimony, day 1, p. 21–22, Exhibits 4 and 5 (labeling for surgeons and dental examination gloves); P. González Testimony.

7. The FDA has statutory authority to conduct inspections of device manufacturers pursuant to 21 U.S.C. § 374.

8. Between February 12 and April 12, 1990, FDA conducted an inspection of claimant's manufacturing facility at Loiza, Puerto Rico, and its rented warehouse at Luquillo, Puerto Rico. Cox Testimony, day 1, p. 16, 65; Testimony of Dianiris Ayala Negrón (Ayala Testimony), day 11, p. 11–12; Testimony of Jorge L. Guadalupe (Guadalupe Testimony), day 7, p. 32–33; P. González Testimony, day 12, p. 5–7.

9. Following the FDA inspection, the FDA issued an eleven page, thirty-five item, list of inspection observations, Form 483, to Plastic Materials noting observed deficiencies in the manufacturing operation in the following categories, among others: 1) organization and personnel; 2) building and environmental controls; 3) manufacturing specifications and processes; 4) finished device inspection; and 5) records. Cox Testimony, day 1, p. 108, 109, 111, and Exhibit 42; P. González Testimony, day 12, p. 9.

10. Following the inspection, FDA also issued a three page, five item, list of inspection observations, Form 483, to Plastic Materials noting observed deficiencies in the warehouse at Loiza, Puerto Rico, pertaining to rodent activity and storage conditions for components and finished product. Cox Testimony, day 1, p. 109, and Exhibit 43.

11. Plastic Materials responded with a letter of explanation (Exhibit H3) in which the firm disputed its obligations under the device good manufacturing practice (GMP) regulations and the Act. P. González Testimony, day 123, p. 71–73; Testimony of Z. Frank Twardochleb (Twardochleb Testimony), day 5, p. 71–72, and Exhibit H3.

12. Therefore, Plastic Materials did not use adequate environmental controls in its manufacturing facility and warehouse. Twardochleb Testimony, day 4, p. 41; Testimony of Philip E. Nickerson (Nickerson Testimony), day 5, p. 91, 92, 99; Testimony of Paris Manaford Brickey (Brickey Testimony), day 4, p. 18.

13. Plastic Materials kept the manufacturing facility doors and unscreened windows open during the glove manufacturing process. Cox Testimony, day 1, p. 30; Exhibit 8; P. González Testimony, day 12, p. 58, 63–64.

14. The Luquillo warehouse that Plastic Materials used had gaps between the roof

1. "Exhibits" refer to the trial exhibits.

and walls and countless holes and openings in the external walls and doors. Cox Testimony, day 1, p. 67, 72; Exhibits 21 and 22.

15. Open doors and windows and holes and gaps in walls and doors provide easy access for rodents, pests, and airborne contaminants. Brickey Testimony, day 4, p. 15; Twardochleb Testimony, day 4, p. 42; Nickerson Testimony, day 5, p. 92, 107.

16. Plastic Materials did not enclose the area in the manufacturing facility that was used to apply cornstarch to the gloves and the airborne cornstarch spread throughout the manufacturing facility and settled on equipment, including the equipment used to process the liquid latex. Cox Testimony, day 1, p. 31, 35, 38, 39, Exhibits 9, 10, 11, 12, 13.

17. The seized cornstarch, latex, package labels, and packaging material was for use in manufacturing latex surgical and dental examination gloves, Exhibits 4, 5, and 36 (labeling), Testimony of María Esther Rosario (Rosario Testimony), day 9, p. 20–23; because Plastic Materials had no other use for those items other than manufacturing such surgical and dental examination gloves. P. González Testimony, day 11, p. 33, 80, day 12, p. 128, day 12, p. 120, 121.

18. Plastic Materials failed to organize its manufacturing facility and warehouse to prevent mix-ups; the lot numbers on an outer carton of gloves was different from the lot number on the inner glove packages, P. González Testimony, day 12, p. 45–46, and Exhibit 44 at p. 18; gloves labeled as sterile were stored in an area supposedly reserved for inspection and packaging, without any indication regarding whether or not they were actually sterilized; Cox Testimony, day 1, p. 43; P. González Testimony, day 12, p. 130; gloves labeled as sterile were stored in the rodent-infested warehouse with supposedly inferior gloves, Cox Testimony, day 1, p. 104. Plastic Materials stored hundreds of gloves in plastic garbage bags which were reused, nor did the firm ensure that the labels would be changed on the reused bags. Cox Testimony at day 1, p. 43, 104; day 2, p. 75–76, day

3, p. 33, 34; Exhibit 44 at p. 18; Rosario Testimony, day 9, p. 31.

19. Plastic Materials used a fan in the manufacturing facility—in the area in which the molds were dipped into the liquid latex—that was covered with a thick coat of the same cornstarch dust that flew throughout the manufacturing facility. Cox Testimony, day 1, p. 47–50 and Exhibit 10.

20. Therefore Plastic Materials did not use effective measures to clean the manufacturing facility. Cox Testimony, day 1, p. 39 and Exhibit 9, 10, 12, and 13.

21. Airborne contamination in a glove manufacturing facility may introduce foreign matter into the finished gloves, causing an inclusion and increasing the likelihood of tears or pinholes. Twardochleb Testimony, day 5, p. 76, 77; Nickerson Testimony, day 5, p. 99.

22. At least sixteen different employees manually performed the dipping and drying procedures. P. González Testimony, day 13, p. 125.

23. Plastic Materials did not establish a standard length of time for the glove molds to be dipped into the latex; each employee determined the dipping time for him or herself. Cox Testimony, day 1, p. 33–34; P. González Testimony, day 13, p. 125.

24. During latex glove manufacturing, the dipping time must be controlled in a uniform, standard, and consistent manner to ensure that the finished glove is safe and effective for its intended use. Twardochleb Testimony, day 4, p. 26, 42; Nickerson Testimony, day 5, p. 90, 96, 97, 108.

25. Plastic Materials permitted each employee to decide independently the speed at which the glove mold was withdrawn from the liquid latex. Cox Testimony, day 1, p. 35; P. González Testimony, day 13, p. 123.

26. During latex glove manufacturing, the speed of withdrawing the latex-coated mold from the liquid latex must be controlled in a consistent and uniform manner to ensure that the finished glove is safe and effective for its intended use. Nickerson Testimony, day 5, p. 90, 94, 97.

27. During latex glove manufacturing, the speed of withdrawing the mold from the liquid latex effects the glove thickness and may cause pinholes. Nickerson Testimony, day 5, p. 93–95; P. González Testimony, day 13, p. 124.

28. Plastic Materials permitted each employee to determine the exact drying time for the latex-coated glove molds. Cox Testimony, day 1, p. 36; P. González Testimony, day 13, p. 126.

29. During latex glove manufacturing, the drying time must be controlled in a uniform, standard, and consistent manner, with a calibrated timing instrument, to ensure that the finished glove is safe and effective for its intended use. Twardochleb Testimony, day 4, p. 26, 42; Nickerson Testimony, day 5, p. 90, 95, 96, 97.

30. Plastic Materials did not have a working thermometer in the heat curing oven. Cox Testimony, day 1, jp. 37; P. González Testimony, day 12, p. 76.

31. During latex glove manufacturing, the heat curing temperature must be controlled at a consistent and uniform level with a thermometer to ensure that the gloves are safe and effective for their intended purposes. Twardochleb Testimony, day 4, p. 26, 42; Nickerson Testimony, day 5, p. 90, 95–97.

32. During latex glove manufacturing, excessive heat during curing will cause the gloves to be brittle, while a temperature that is too low will cause the gloves to be sticky. Nickerson Testimony, day 5, p. 95.

33. Plastic Materials did not monitor the viscosity (thickness) of the liquid latex in a consistent, standard, and uniform manner. Twardochleb Testimony, day 4, p. 42, 63; Nickerson Testimony, day –, p. 92; *see also* P. González Testimony, day 13, p. 123–125.

34. During latex glove manufacturing, latex viscosity must be monitored with a special instrument called a viscometer, to ensure that the latex is of the proper thickness to produce a glove that is safe and effective for its intended purposes. Twardochleb Testimony, day 4, p. 63; Nickerson Testimony, day 5, p. 90, 93.

35. During latex glove manufacturing, the viscosity of the liquid latex changes when extra latex or other material is added or if the temperature varies. Nickerson Testimony, day 5, p. 93; P. González Testimony, day 13, p. 124–126.

36. Plastic Materials did not establish a standard dipping time, withdrawal rate, heat curing temperature, or latex viscosity in the device master record (DMR), for each employee to follow, and provided only a general range for the drying time. Cox Testimony, day 2, p. 83, 85; P. González Testimony, day 13 at p. 125–127.

37. Plastic Materials did not record the dipping time, drying time, withdrawal rate, heat curing temperature, or latex viscosity in the device history record (DHR) for each lot of gloves produced. Cox Testimony, day 3, p. 54; P. González Testimony, day 13, p. 125–127.

38. The device matter record (DMR) pertaining to latex glove manufacturing must include dipping time, drying time, withdrawal rate, heat curing temperature, and latex viscosity, to ensure that each employee performs such procedures in a uniform manner for each lot of gloves, and that, therefore each lot of gloves is safe and effective for its intended use. Twardochleb Testimony, day 4, p. 29, 43; Nickerson Testimony, day 5, p. 90, 108.

39. The device history record (DHR) pertaining to latex glove manufacturing, must include the dipping time, drying time, withdrawal rate, the heat curing temperature, and latex viscosity, with respect to each lot of gloves to establish that each lot of gloves was produced in accordance with the standard set forth in a firm's DMR and to ensure that each lot of gloves is safe and effective for its intended use. Nickerson Testimony, day 5, p. 90, 108; Twardochleb Testimony, day 4, p. 29, 43, 64.

40. Plastic Materials received complaints about the quality of its gloves including complaints about hardening, a tendency to tear, a tendency to rip and develop holes, poor sizing, and inadequate powder. P. González Testimony, day 13, p. 140–141.

41. Plastic Materials' employee training consisted of on the job training. P. González Testimony, day 11, p. 84; Rosario testimony, day 9, p. 26, 28; Testimony of María Esther González (M. González Testimony), day 9, p. 60.

42. Plastic Materials' employees wore jewelry, makeup, and nail polish while handling the gloves. Exhibits N7 and O7 (photos).

43. Jewelry could puncture the gloves during handling, Nickerson Testimony, day 5, p. 102, long fingernails could damage the gloves and nail polish and lipstick could rub off onto the product. M. González Testimony, day 9, p. 61, 62, 64; *see also* Rosario Testimony 33.

44. A predetermined, standard volume of air must be used to inflate a latex glove during leak testing, and the glove must remain inflated for a specific length of time, otherwise the results are inconclusive and meaningless. Nickerson Testimony, day 5, p. 99–100; Twardochleb Testimony, day 4, p. 33–35, 39–40; *see also* Kilham Testimony, day 10, p. 66.

45. Plastic Materials did not establish a standard or control the volume of air that the employees introduced into the gloves when performing an air inflation (leak) test; each employee decided how much air to use independently. Cox Testimony, day 1, p. 42; M. González Testimony, day 9, p. 66; Kilham Testimony, day 10, p. 66.

46. At least 35–40 different Plastic Materials' employees performed the initial, "100%", air inflation testing on the gloves. Rosario Testimony, day 9, p. 7.

47. Some of Plastic Materials' employees inflated the gloves orally. Cox Testimony, day 1, p. 40–41.

48. The Plastic Materials' employees inflated the gloves for five to seven seconds during the "final" air inflation testing. M. González Testimony, day 9, p. 66–67.

49. Plastic Materials adopted a leak testing method developed by the American Society for Testing and Materials ("ASTM") in its device master record (DMR). Cox Testimony, day 3, p. 63–66; Twardochleb Testimony, day 5, p. 73; Ex-

hibit 44 at p. 30; P. González Testimony, day 11, p. 85; Exhibit I6.

50. The ASTM method consists of three separate tests: 1) physical requirements, (tensile strength and ultimate elongation), which involves cutting a piece of glove and testing it in a machine for strength; 2) physical dimensions test (length, width, and thickness of the glove); 3) leak testing, in which an exam glove is tested in a water tight test, while the surgeon's glove is inflated to a known amount of pressure and immersed in water while the tester checks for air bubbles. Twardochleb Testimony, day 4, p. 24, 66 through 72; Kilham Testimony, day 10, p. 35, 39, 62 and Exhibit A6.

51. Plastic Materials did not perform physical requirements testing. Cox Testimony, day 1, p. 41–42; Twardochleb Testimony, day 4, p. 66, 68, 70, 71, 72; Rosario Testimony, day 9, p. 11; M. González Testimony, day 9, p. 42, Exhibit J3.

52. Plastic Materials did not perform the inflation leak testing according to the ASTM method, because it did not perform the water immersion or water leak test at all, and it did not inflate the gloves with a known, standard amount of air for a specified period of time. Twardochleb Testimony, day 4, p. 42, 67 through 70, day 5, p. 73, 74; Cox Testimony, day 1, p. 42; P. González Testimony, day 12, p. 7, 144; M. Rosario Testimony, day 9, p. 10–11; M. González Testimony, day 9, p. 42, 45, 66.

53. In March 1990, Plastic Materials did not have a current written audit plan or audit reports. P. González Testimony, day 12, p. 42, day 13, p. 141; Exhibit 44, at p. 17.

54. 21 C.F.R. § 820.20(b) requires that periodic audits be conducted of a device manufacturer or distributor's quality assurance program. The audit procedures as well as the audit results must be in writing.

55. Plastic Materials did not calibrate the compressed air stations that it used for finished product testing. P. González Testimony, day 12, p. 144.

56. 21 C.F.R. § 820.61, requires that all production and quality assurance measurement equipment be routinely calibrated, in-

spected, and checked according to written procedures.

57. Finished product testing does not establish compliance with the good manufacturing practice regulations. Twardochleb Testimony, day 4, p. 37; Nickerson Testimony, day 5, p. 101; Kilham Testimony, day 10, p. 66, 67, 68.

58. The good manufacturing practice regulations, 21 C.F.R. § 820, apply to all finished devices. 21 C.F.R. § 820.1(c); Twardochleb Testimony, day 4, p. 33, day 5, p. 73 and 76.

59. Plastic Materials used the same manufacturing process between 1988 and 1990. P. González Testimony, day 12, p. 127.

60. Plastic Materials held packing materials, in-process gloves, finished and packaged gloves, and some bags of cornstarch at the Loíza manufacturing plant. Cox Testimony, day 1, p. 43; Exhibits 16 and 17.

61. Cornstarch is a food for rodents. Brickey Testimony, day 4, p. 14, 15.

62. Packing materials and gloves are the types of materials that rodents seek and use for building nests. Brickey Testimony, day 4, p. 12, 15.

63. Rodents are attracted by open doors and windows, holes in the walls, and food and nesting material. Brickey Testimony, day 4, p. 12, 14, 15.

64. Plastic Materials' Loíza manufacturing plant harbored rodents. Cox Testimony, day 1, p. 53–54; Brickey Testimony, day 4, p. 18, 21; Exhibits 12, 15, 16, and 17.

65. The Luquillo warehouse that Plastic Materials used harbored rodents. Cox Testimony, day 1, p. 77–79; Brickey Testimony, day 4, p. 18, 19, 21; Testimony of Joaquín Palau Soltero (Palau Testimony), day 3, p. 10 through 16; Exhibits 23 through 41 and 47 through 50.

66. The presence of rodents in the manufacturing facility could easily cause the in-process gloves to become contaminated with rodent filth, because rodent hair can mix with the dust and cornstarch in the air and settle in the liquid latex. Brickey Tes-

timony, day 4, p. 21; Nickerson Testimony, day 5, p. 92.

67. Plastic Materials used the Luquillo warehouse to store device components, packaging materials, and finished products. Cox Testimony, day 1, pp. 65–78, 104, 105; Exhibits 22 and 28.

68. The cornstarch that Plastic Materials stored at the Luquillo warehouse was a specific type, used only in manufacturing devices, latex gloves. P. González Testimony, day 11, p. 80.

69. The cornstarch at the Luquillo warehouse contained rodent hair, rodent-gnawed bagging material, and rodent excreta. Palau Testimony, day 3, p. 10 through 16; Exhibits 47, 48, 49, 50; Brickey Testimony, day 4, p. 21; Guadalupe Testimony, day 7, p. 37–41; Ayala Testimony, day 11, p. 16–17.

## CONCLUSIONS OF LAW

### I. STATUTORY AND REGULATORY FRAMEWORK

#### A. *Device Definition*

The Act, 21 U.S.C. § 321(h), defines a device as

an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is—

\* \* \* \* \* \*

(2) intended for use in the \* \* \* \* \* treatment, or prevention of disease, in man or other animals,

\* \* \* \* \* \*

which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of any of its principal intended purposes.

■ Both surgeons gloves, *see* 21 C.F.R. § 878.4460, and examination gloves, *see* 21 C.F.R. § 880.6250, are devices under the Act. Moreover, the glove components, parts, and accessories, are clearly devices as well. 21 U.S.C. § 321(h). *See United*

*States v. 22 Rectangular or Cylindrical Devices,* 714 F.Supp. 1159, 1164 (D.Utah 1989) (device includes any "component, part, or accessory").

██ Whether a product's intended use makes it a device depends, in part, on the manufacturer's *objective* intent in promoting and selling the product. All of the circumstances surrounding the promotion and sale of the product constitute the "intent". It is not enough for the manufacturer to merely *say* that he or she did not "intend" to sell a particular product as a device. *See* 21 C.F.R. § 801.4; *United States v. An Article of Device,* 731 F.2d 1253, 1256–58 (7th Cir.), *cert. denied,* 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 186 (1984). Rather, the actual circumstances surrounding the product's sale, such as the identify of actual customers and their use of the product and labeling claims, determine the "intended" use of the product as a device under the Act. *See United States v. 22 Rectangular or Cylindrical Devices,* 714 F.Supp. 1159, 1165 (D.Utah 1989).

██ Indeed, when a manufacturer has created a market for a product to be used as a device, he or she cannot avoid the reaches of the Act by stating that the product has a different—and non-regulated use. The Court's have recognized the "carry-over effect" that is created by a manufacturer's original representations about the product. *See United States v. Midwest Pharmaceuticals, Inc.,* 890 F.2d 1004, 1008 (8th Cir.1989) (change in advertising not adequate to counter consumer's expectations regarding misbranded drug); *accord United States v. 3 Cartons, More or Less, "No. 26 Formula GM,"* 132 F.Supp. 569, 574 (S.D.Cal.1952).

B. *A Device That is Not Manufactured in Compliance with Good Manufacturing Practice is Adulterated as a Matter of Law*

1. Adulteration

Under the Act, a device is *"deemed"* to be adulterated if:

the methods used in, or the facilities or controls used for, its manufacture, packing, storage, or installation are not in conformity with applicable requirements under [21 U.S.C. § 360j(f)(1) (the GMP regulations)]

21 U.S.C. § 351(h).

██ Adulterated medical devices are liable to seizure and condemnation at any time, and without proof of interstate commerce. 21 U.S.C. § 334(a)(2)(D).

██ The Act, 21 U.S.C. § 351(h), specifically regulates the device *manufacturing process,* rather than the end product of that process. Therefore, if the manufacturing process does not conform to the GMP regulations, the devices are adulterated as a matter of law. 21 U.S.C. § 351(h).

██ The GMP provisions of the statute for devices and human drugs [2] and their implementing regulations, are prophylactic measures designed to *prevent* the distribution of poorly manufactured drugs and devices "by giving the Food and Drug Administration ... additional authority to require that sound methods, facilities, and controls be used in all phases of drug manufacturing and distribution." *United States v. Bel–Mar Laboratories, Inc.,* 284 F.Supp. 875, 881 (E.D.N.Y.1968); *see also United States v. An Article of Drug,* 484 F.2d 748, 751 (7th Cir.1973). Simply put, the GMP regulations are intended to be preventive, by requiring manufacturers to build quality into their devices, rather than permit a defective device to be distributed and used to treat patients.

Congress added the GMP provision for medical devices to the Act in 1976, to improve the quality and reliability of devices and to ensure their integrity from the beginning of manufacture through delivery to the ultimate consumer. Congress noted that, without such authority, FDA would only learn of unsafe and ineffective medi-

**2.** A parallel provision which is comparable to the device GMP, provides that a drug that is not manufactured in conformity with current good manufacturing practice is likewise deemed adul-terated under 21 U.S.C. § 351(a)(2)(B). The GMP regulations for drugs are set forth at 21 C.F.R. §§ 210 and 211.

cal devices after those products has been distributed to the public. Such after-the-fact regulatory action would offer little or no protection to those members of the public already exposed to—or harmed by—unsafe or ineffective medical devices. *See* 122 Cong.Rec. 5, 855–56 (1976) (statement of Rep. Maguire); *cf.*, H.R. 2464, 87th Cong., 2d Sess. 1–2 (1962) (same reasoning applied to the parallel provision of the Act concerning human drugs).

### 2. A Device that Was Not Manufactured in Compliance with GMP is Adulterated, Even if the Device Does Not Contain Any Actual Defects

■ The government need not establish that the seized devices contain any actual defects—or caused any harm—to prove that the seized articles are adulterated.

In a recent case, applying the device GMP regulations in a seizure brought under 21 U.S.C. § 334, the Court held that "[in] order to prove a claim of adulteration of a device based upon noncompliance with GMP regulations, the Government need not establish that the device is *actually deficient* as a result of the GMP violation." *United States v. Various Articles of Device ... Proplast II*, 800 F.Supp. 499, 502 (S.D.Tex.1992).

Courts applying the parallel human drug GMP provisions have invariably found that products manufactured in violation of GMP are adulterated as a matter of law, without any showing of actual defects. *See United States v. Dianovin Pharmaceuticals*, 342 F.Supp. 724, 728–729 (D.P.R.1972), *aff'd*, 475 F.2d 100 (1st Cir.), *cert. denied*, 414 U.S. 830, 94 S.Ct. 60, 38 L.Ed.2d 65 (1973) (drugs not manufactured in conformity with GMPs are adulterated; *United States v. Western Serum Co., Inc.*, 498 F.Supp. 863, 867 (D.Ariz.1980), *aff'd*, 666 F.2d 335 (9th Cir.1982) ("[t]he Act is concerned with the manner in which a drug is produced as well as its composition and content"); *United States v. Lit Drug Co.*, 333 F.Supp. 990, 998 (D.N.J.1971) (a drug may be pharmaceutically perfect in content but still be regarded as adulterated under the law);

*United States v. Bel–Mar Laboratories, Inc.*, 284 F.Supp. 875, 881–883 (E.D.N.Y. 1968) (drug manufactured in violation of GMPs is adulterated, whether or not it is actually deficient).

There can be no dispute that the case law construing "good manufacturing practice" in the context of drugs applies equally to medical devices. The Supreme Court has recognized that there is no difference between drugs and devices with respect to a regulated entity's obligation to comply with the FDC Act:

> Thus, it is clear that two parallel definitions [drug and device] were provided for semantic reasons only; for the purposes of the Act, the two definitions had the same effect of subjecting both drugs and devices to the adulteration and misbranding provisions.

*United States v. An Article of Drug*, 394 U.S. 784, 797, 89 S.Ct. 1410, 1417, 22 L.Ed.2d 726 (1969).

In light of the foregoing, there can be no serious question regarding the legal basis upon which the government seeks to condemn the seized articles.

### C. *Devices That Contain Filth Are Adulterated as a Matter of Law*

■ Under the Act, 21 U.S.C. § 351(a)(1), a device is deemed to be adulterated "if it consists in whole or in part of any filthy, putrid, or decomposed substance."

This section of the Act forbids any and all filth, thus it is clear that the government need only prove the presence of filth. *See United States v. Cassaro*, 443 F.2d 153, 157 (1st Cir.1971); *United States v. 484 Bags, More or Less*, 423 F.2d 839, 841 (5th Cir.1970) (both cases applying the comparable section of the Act prohibiting filth in foods—21 U.S.C. § 342(a)(3)).

### D. *Devices Held Under Insanitary Conditions Are Adulterated as a Matter of Law*

■ Under the Act, 21 U.S.C. § 351(a)(2)(A), a device is deemed to be adulterated "if it has been prepared,

packed, or held under insanitary conditions whereby it may have been contaminated with filth."

 This section of the Act regulates the device's manufacturing and storage conditions and environment; the government is not required to prove *any actual* contamination of the product to establish adulteration. *See United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 90, 84 S.Ct. 559, 562, 11 L.Ed.2d 536 (1964); *United States v. Cassaro, Inc.*, 443 F.2d 153, 157 (both cases applying the comparable statutory section regulating food storage conditions. 21 U.S.C. § 342(a)(4)). The government need only prove that there is a reasonable expectation that the articles *could* become contaminated with filth. *See Berger v. United States*, 200 F.2d 818, 821 (8th Cir.1952); *United States v. Cassaro, Inc.*, 443 F.2d at 157; *United States v. Gel Spice Co., Inc.*, 601 F.Supp. 1205, 1211 (E.D.N.Y.1984), *aff'd*, 773 F.2d 427 (2d Cir. 1985), *cert. denied*, 474 U.S. 1060, 106 S.Ct. 804, 88 L.Ed.2d 780 (1986); *United States v. King's Trading, Inc.*, 724 F.2d 631, 632 (8th Cir.1983).

## II. SPECIFIC REGULATORY VIOLATIONS

### A. *The GMP Regulations Are Binding and Have the Force and Effect of Law*

 The GMP[3] regulations for medical devices, 21 C.F.R. § 820, which were promulgated pursuant to 21 U.S.C. § 360j(f)(1) and FDA's general rulemaking authority, 21 U.S.C. § 371(a), are binding and have the force and effect of law. *See, e.g., National Ass'n of Pharmaceutical Manufacturers v. FDA*, 637 F.2d 877, 879–881, 889 (2d Cir.1981) ("Reading [§ 371(a)] ... one would have little difficulty in concluding that the words suffice to empower the ... FDA ... to issue regulations ... having the force of law") (case upholding drug GMP regulations); *see also, Weinberger v. Hynson, Westcott and Dunning, Inc.*, 412 U.S. 609, 618–622, 93 S.Ct. 2469, 2477–2479,

37 L.Ed.2d 207 (1973). A broad-based challenge to the content of the GMP regulations for drugs has been rejected. *National Ass'n of Pharmaceutical Manufacturers v. Dep't Health and Human Services*, 586 F.Supp. 740 (S.D.N.Y.1984). The constitutionality of the phrase "good manufacturing practice" and the parallel GMP regulations for drugs is settled. *See, e.g., An Article of Drug*, 484 F.2d at 751; *Bel–Mar Laboratories, Inc.*, 284 F.Supp. at 880–883.

### B. *Full Compliance with the GMP Regulations is Required as a Matter of Law*

 A device is adulterated, as a matter of law, if there is a single instance of failing to conform to the GMP regulations. *See* 21 C.F.R. § 820.1(a). Courts have accorded deference to the FDA's determination that a firm is in violation of the GMP regulations. Indeed, the *Proplast II* court held that "whether a manufacturer is, in the Court's estimation, in *substantial* compliance with GMP regulations is immaterial if the FDA, in its discretion, determines that *full* compliance with the regulation is necessary." *Proplast II, supra*, slip op. at 6. Likewise, in *United States v. Western Serum Co., Inc.*, 498 F.Supp. 863 (D.Ariz. 1980), *aff'd*, 666 F.2d 335 (9th Cir.1982), although the court found only four GMP violations, it nevertheless held:

> Whether full compliance with the GMPs is either possible or necessary is an issue that is not within this Court's competence. Rather, this is a matter properly left to determination by the FDA.

*Western Serum*, 498 F.Supp. at 867–868. Therefore, so long as the government has proved a single violation of the GMP regulations, the seized articles are adulterated as a matter of law.

Moreover, the law does not permit a device manufacturer to weigh the relative importance of the various GMP regulations. Congress entrusted these decisions to the FDA. *See National Association of Pharmaceutical Manufacturers*, 637 F.2d

---

**3.** At trial, the Court took judicial notice of the final rule establishing the GMP regulations, 43 Fed.Reg. 31,508 (1978).

at 889. Were this Court to accept claimant's approach to GMP compliance—affording complete and absolute discretion to the manufacturer regarding the degree and method of implementation—the regulations would not be binding, and every manufacturer would be able to unilaterally pick an choose which regulations it could conveniently and economically obey, and which it could ignore. Such an interpretation would completely undermine the purpose of the GMP regulations, because every manufacturer could, in effect, establish its own standard for safe and effective devices.

The final rule establishing the device GMP regulations also makes clear that complete control over all manufacturing processes is a fundamental principle of the GMP.[4] It states that the:

> GMP regulation has been developed in accordance with basic principles of quality assurance. (See, for example, Juran, *Quality Control Handbook*, 3d ed., ... (1974)). These principles have as their goal the production of articles that are fit for their intended uses, and may be stated as follows: (1) Quality, safety, and effectiveness must be designed and built into the product; (2) quality cannot be inspected or tested into the finished product; and (3) *each step of the manufacturing process must be controlled to maximize the probability that the finished product meets all quality and design specifications.*

43 Fed.Reg. 31,509 (1978) (emphasis added).

Moreover, FDA's interpretation of the extent of implementation required under its GMP regulations is entitled to substantial deference. As the Supreme Court has held:

> It is well established "that *an agency's construction of its own regulations is entitled to substantial deference.*" In situations in which "the meaning of [regulatory] language is not free from doubt" the reviewing court should give effect to the agency's interpretation so long as it is "reasonable", that is, so long as the interpretation *"sensibly conforms to the purpose and wording of the regu-*

*lations."* Because applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policy making prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers.

*Martin v. Occupational Safety and Health Review Comm.,* — U.S. —, —–—, 111 S.Ct. 1171, 1175–76, 113 L.Ed.2d 117 (1991) (citations omitted) (emphasis added). "When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). An agency's interpretation of its regulations is controlling "unless it is plainly erroneous or inconsistent with the regulation." *Tallman,* 380 U.S. at 16–17, 85 S.Ct. at 801–802; *see also, Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 358, 109 S.Ct. 1835, 1850, 104 L.Ed.2d 351 (1989) (and cases cited therein).

Furthermore, absolute compliance with the GMP regulations is required, regardless of any cost or hardship alleged by the claimant, and without respect to the manual nature of claimant's operation. As the Supreme Court has clearly and repeatedly recognized in cases arising under the Act, the difficulties or hardships of a manufacturer who voluntarily enters a regulated industry cannot outweigh the interests of the public in protection from products that violate the law:

> The requirements of foresight and vigilance imposed on responsible corporate agents are beyond question demanding, and perhaps onerous, but they are no more stringent that the public has a right to expect of those who voluntarily assume positions of authority in business enterprises whose services and products effect the health and well-being of the public.

*United States v. Park,* 421 U.S. 658, 672, 95 S.Ct. 1903, 1911, 44 L.Ed.2d 489 (1975). *See also, Ewing v. Mytinger &*

---

4. 43 Fed.Reg. 31,509 (1978).

*Casselberry, Inc.*, 339 U.S. 594, 601, 70 S.Ct. 870, 874, 94 L.Ed. 1088 (1950) (potential injury to a regulated business because of seizures under the Act cannot outweigh the public interest in being protected from defective products); *United States v. Dotterweich*, 320 U.S. 277, 285, 64 S.Ct. 134, 138, 88 L.Ed. 48 (1943) (in balancing hardships under the Act, the interests of a regulated business cannot outweigh those of "the innocent public who are wholly helpless").

█ A manufacturer has no right to conduct a business regulated by the Act in an unlawful manner. *United States v. Diapulse Corporation of America*, 457 F.2d 25, 29 (2d Cir.1972); *United States v. Ellis Research Laboratories, Inc.*, 300 F.2d 550, 554 (7th Cir.), *cert. denied*, 370 U.S. 918, 82 S.Ct. 1558, 8 L.Ed.2d 499 (1962). The Act:

> does not provide that parties shall avoid doing such things if it is possible, it provides that it shall not be done at all. A party who cannot prepare proper * * * products under [proper] conditions must cease putting such products into interstate commerce.

*United States v. Lazere*, 56 F.Supp. 730, 733 (N.D.Iowa 1944).

### C. *GMP Violations*

1. Environmental Control Requirements

█ Title 21 C.F.R. §§ 820.40 and 820.46 state:

> Buildings in which manufacturing, assembling, packaging, packing, holding, testing, or labeling operations are conducted shall be of suitable design and contain sufficient space to facilitate adequate cleaning, maintenance, and other necessary operations. The facilities shall provide adequate space designed to prevent mixups and to assure orderly handling of the following: Incoming components; rejected or obsolete components; in-process components; finished devices; labeling; devices that have been reprocessed, reworked, or repaired; equipment; molds, patterns, tools, records, drawings, blueprints; testing and laboratory operations; and quarantined products. 21 C.F.R. § 820.40.

> Where environmental conditions at the manufacturing site could have an adverse effect on a device's fitness for use, these environmental conditions shall be controlled to prevent contamination of the device and to provide proper conditions for each of the operations performed pursuant to § 820.40. Conditions to be considered for control are lighting, ventilation, temperature, humidity, air pressure, filtration, airborne contamination, and other contamination. Any environmental control system shall be periodically inspected to verify that the system is properly functioning. Such inspections shall be documented. 21 C.F.R. § 820.46.

The evidence at trial showed that Plastic Materials did not have adequate controls in its buildings. The government presented uncontroverted evidence that the firm left the manufacturing facility doors and unscreened windows open during the manufacturing process and that cornstarch powder blew throughout the manufacturing area. Cox Testimony, day 1, p. 30, and Exhibit 8. Likewise the warehouse that the firm used had countless openings, holes, and gaps in the doors and walls. Cox Testimony, day 1, p. 67, 72; Exhibits 21 and 22. Claimant did not even attempt to dispute the government's evidence establishing that the warehouse harbored rodents. Claimant could not present any evidence to contradict the testimony of the government's experts, Mr. Brickey and Mr. Nickerson, that: the conditions in the manufacturing facility attracted rodents; the manufacturing facility did harbor rodents; and rodent hairs and filth could easily contaminate the in-process gloves. Brickey Testimony, day 4, p. 12, 14–21; Nickerson Testimony, day 5, p. 91, 92, 99.

Plaintiff's witness, Mr. Brickey, a well-recognized and widely-respected expert in identifying filth, unequivocally testified that rodents were present in both of Plastic Materials' buildings. Brickey Testimony, day 4, p. 18–21. *See United States v. King's Trading, Inc.*, 724 F.2d 631, 633 (8th Cir.1983) (Mr. Brickey's Testimony interpreting the data collected by FDA inves-

tigators and his conclusion that a warehouse was rodent infested recognized by the court). Significantly, although claimant presented Dr. Kilham as an expert in filth analysis, he did not testify that either of the firm's buildings was free of rodent contamination.

Claimant offered the theory, through the testimony of Dr. Kilham, that sterilization would somehow remedy any filth in the gloves. However, such an argument does not address the government's allegation because sterilization would not remove any foreign matter that the gloves might contain. Moreover, claimant's own evidence undermines its argument, for claimant did not sterilize the dental examination gloves. P. González Testimony, day 12, p. 54.

Likewise, the government presented uncontroverted evidence that the rodent-infested warehouse contained boxes of finished, packaged, gloves that were clearly labeled as sterile surgeon's gloves and dental examination gloves. Cox Testimony, day 1, p. 104.

In addition, the claimant provided further evidence that the firm failed to organize its buildings in a manner sufficient to prevent mix-ups. Mr. González admitted that he opened a carton of gloves during Mr. Cox's visit, in which the lot number on the carton did not match the lot number on the gloves. Although Claimant attempts to minimize this violation as "just a mistake," P. González Testimony, day 12, p. 45–46, the fact remains that the GMP regulations are intended to establish controls to prevent *exactly* this type of "mistake."

The government established other violations of 21 C.F.R. § 820.40. Mr. Cox testified that the labeling on the plastic garbage-type bags—which claimant used to store gloves—was unreliable because some bags were not labeled at all while others contained inconsistent types of information. Cox Testimony, day 1, p. 43, 104, day 2, p. 75–76, day 3, p. 33, 34. Claimant's witness, Ms. Rosario, could only theorize that some other—absent and unidentified—employee was responsible for placing the correct labels on the bags and changing those labels when the bags were reused. Rosario Testimony, day 9, p. 31.

2. Manufacturing Process Control Requirements

 21 C.F.R. §§ 820.100 requires that: Written manufacturing specifications and processing procedures shall be established, implemented, and controlled to assure that the device conforms to its original design or any approved changes in that design.

The government presented uncontroverted evidence that claimant did not control the steps of its manufacturing process. Specifically, claimant did not establish a standard length of time for the glove molds to be dipped into the liquid latex ("dipping time"); a standard speed for withdrawing the molds from the latex ("withdrawal rate"); a standard time or temperature for the gloves to spend in the various ovens ("drying time" and "drying temperature"); or a standard for the thickness ("viscosity") of the liquid latex. Cox Testimony, day 1, p. 33–37. Each of these establish a separate GMP violation.

In fact, claimant freely admits to each of these deficiencies. P. González Testimony, day 13, p. 123–126. Claimant states that each of the manufacturing processes and procedures discussed above was subject to the discretion of the individual employee. Such a system could hardly establish control over the process. At least sixteen employees performed these processes and procedures, resulting in at least sixteen varying interpretations for each step. P. González Testimony, day 13, p. 125.

The government's experts, Mr. Twardochleb and Mr. Nickerson, each testified that Plastic Materials' manufacturing processes and procedures were unacceptable and incapable of ensuring that the finished gloves would be safe and effective when used for their intended purpose. Twardochleb Testimony, day 4, p. 26, 42, 63. Nickerson Testimony, day 5, p. 90–97. Mr. Nickerson also testified that the failure to regulate and control the steps of the manufacturing processes and procedures could result in gloves that were brittle, sticky,

and prone to holes and tears. Nickerson Testimony, day 5, p. 93–95. Not surprisingly, claimant received complaints from the Department of Defense that its gloves tore easily, and tended to harden and develop rips and holes. P. González Testimony, day 13, p. 140–141.

Claimant produced no expert testimony to dispute that of the government's experts. Instead, claimant relied on the testimony of its president, Mr. González, who merely offered his own opinion that he disagreed with plaintiff's experts.

Moreover, claimant persistently argued that, because the GMP regulations afford some discretion to the device manufacturer in their implementation, that whatever the manufacturer decided to do—including the failure to implement any controls at all—could not be found inadequate by the FDA. This argument ignores the clear language of those regulations, which state that the manufacturer must establish a level of control sufficient to ensure a safe and effective device. *See* 21 C.F.R. § 820.1; *see also* 43 Fed.Reg. 31,508; 31,526, (1978). ("The decisions a manufacturer makes to tailor specific manufacturing needs to quality assurance will be carefully evaluated by FDA. The industry should understand, however, that this regulation has the force of law, and that violation of its provisions are a basis for seizure, injunction, and for prosecution"). The government proved through the testimony of the experts, that claimant did not establish or maintain a level of control sufficient to ensure that its gloves were safe and effective when used for their intended purpose.

### 3. Requirements to Monitor Employee Handling of Devices

■ Title 21 C.F.R. § 820.25 provides in pertinent part:

> Each manufacturer shall have sufficient personnel with the necessary education, background, training, and experience to assure that all operations are correctly performed.... Personnel in contact with a device or its environment shall be clean, healthy, and suitably attired where lack of cleanliness, good health, or suit-

able attire could adversely affect the device.

Plastic Materials' employees handled the gloves while wearing makeup, long fingernails, nail polish, and jewelry. Claimant's Exhibits N7 and O7. Mr. Nickerson testified—as did claimant's witness, Ms. González—that such practices could damage the gloves and were unacceptable. Nickerson Testimony, day 5, p. 102; M. González Testimony, day 9, p. 61–64. Indeed, Ms. González went to great lengths to explain that the firm did not permit employees to have long fingernails or to wear makeup, nail polish, or jewelry while handling the gloves. M. González Testimony, day 9, p. 61–64.

Ms. González' explanation of the reason for permitting the employees to wear clear nail polish, while prohibiting dark polish and lipstick, provides yet another example of the firm's complete lack of understanding regarding the most basic GMP principles. Ms. González testified that nail polish was prohibited, not because it would contaminate the gloves or glove packaging, but because such contamination would be visible. This witness, although presented by claimant as its quality control supervisor, in effect testified that defects only exist if they can be seen. Yet, unseen defects are exactly the type of adulteration that the GMP regulations were enacted to prevent. *See* H.R. 2464, 87th Cong., 2d Sess. 2 (1962); 122 Cong.Rec. 5,855–56 (1976).

### 4. Compilation and Maintenance of Records Requirements

■ Title 21 C.F.R. §§ 820.180, 820.181, and 820.184 set forth the general requirements for maintenance of records, a device master record and a device history record. The government proved that the claimant failed to adequately maintain two types of records: the device master record (DMR), which must contain the standard specifications for each and every step in the manufacturing process—occasionally called the "recipe"—and the device history record (DHR), which must document the manner in which each manufacturing process and

procedure was performed for every lot of the gloves.

Plaintiff proved that claimant's DMR failed to include significant information such as the dipping time, drying time and exact temperature, withdrawal rate, and latex viscosity. Nor did the firm record this information in the DHR for each lot of gloves produced. Cox Testimony, day 2, p. 83–85, day 3, p. 54; P. González Testimony, day 13, p. 125–127. The government's experts, Mr. Twardochleb and Mr. Nickerson, each testified that, because such information is not recorded in the DMR and DHR, claimant cannot ensure that any of its gloves are safe and effective when used for their intended purpose. Twardochleb Testimony, day 4, p. 29, 43, 64; Nickerson Testimony, day 5, p. 90, 108.

██ Claimant attempted to blur the issue by producing some records, and excerpts of documents that it called its DMR and DHR. The government did not allege, however, that claimant did not have any records at all. Rather, as plaintiff's witnesses testified, the contents of such documents are inadequate and constitute the violation. A manufacturer simply cannot fulfill its obligation to maintain a DMR and DHR by labeling pieces of paper with those titles and submitting only some of the essential information. *See, e.g.,* claimant's exhibits, H6, I6, and K6. Claimant's exhibits do not contain the dipping time, withdrawal rate, heat curing time and temperature, or latex viscosity. Claimant admitted that it did not maintain such records. P. González Testimony, day 13, p. 125–127.

5. Finished Device Testing Requirement

██ 21 C.F.R. § 820.160 states:

There shall be written procedures for finished device inspection to assure that device specifications are met. Prior to release for distribution, each production run, lot or batch shall be checked and, where necessary, tested for conformance with device specifications. Where practical, a device shall be selected from a production run, lot or batch and tested under simulated use conditions. Sampling plans for checking, testing, and re-

lease of a device shall be based on an acceptable statistical rationale. Finished devices shall be held in quarantine or otherwise adequately controlled until released.

A persistent theme that claimant presented throughout the trial was that, because it "tested" the finished devices, manufacturing controls were irrelevant. Yet, both of the government's experts, Mr. Twardochleb and Mr. Nickerson, as well as claimant's own expert, Dr. Kilham, testified that finished product testing will not establish compliance with the GMP regulations. Twardochleb Testimony, day 4, p. 37; Nickerson Testimony, day 5, p. 101; Kilham Testimony, day 10, p. 66, 67, and 68.

The violations that the government established regarding claimant's testing are based on the manner in which such testing was performed; the firm's employees did not adhere to any recognized glove testing standard, including the one that claimant adopted in its own DMR. The failure to conform to standards adopted by a firm in its own DMR constitutes an additional GMP violation under 21 C.F.R. §§ 820.181 and 820.184.

Claimant adopted the three-part ASTM test method in its DMR, however, it failed to conduct one part of that method (the physical requirements testing) and did not follow the ASTM standard procedures in conducting the second part (the leak testing). Claimant did not dispute that it failed to follow ASTM procedures; the firm's employees did not fill the gloves with a predetermined, standardized volume of air and keep the glove inflated for a prescribed length of time. Cox Testimony, day 1, p. 41–42; Twardochleb Testimony, day 4, p. 42, 66–72, day 5, p. 73, 74; M. González Testimony, day 9, p. 42, Exhibit J3. The firm's employees merely inflated the gloves with some unspecified, unknown amount of air. M. González Testimony, day 9, p. 42. Because of this lack of adherence to recognized, proven standards, the firm's testing cannot be relied upon to ensure that the devices are safe and effective when used for their intended purposes. Nickerson

Testimony, day 5, p. 100; Twardochleb Testimony, day 4, p. 39–40.

Plaintiff also presented evidence that Plastic Materials' employees orally inflated the gloves during the firm's "testing." Cox Testimony, day 1, p. 41. Claimant's evidence hardly rebutted that of the government; claimant produced two former employees who had, along with at least 35–40 others, conducted the "100%" and "final" tests. Although these witnesses described inflating the gloves by waving them in the air or by using a machine, and failed to mention oral inflation, the government notes that these were the same witnesses who asserted that the employees in the testing area could not have long fingernails, wear jewelry, makeup or nail polish.[5] Significantly, Mr. González, who gave a most painstaking commentary on FDA investigator Cox's testimony and on Exhibit 44—which contained Mr. Cox's observations—failed to deny or even mention this particular testimony and evidence while under oath. *See* P. González Testimony, day 13, p. 4–10; Exhibit 44 at p. 31.

### 6. Calibration Requirement

■ 21 C.F.R. § 820.61 states in pertinent part:

[E]quipment shall be routinely calibrated, inspected, and checked according to written procedures ... Calibration procedures shall include specific directions and limits for accuracy and precision. There shall be provisions for remedial action when accuracy and precision limits are not met. Calibration shall be performed by personnel having the necessary education, training, background, and experience.

Claimant freely admits to this violation, arguing that compliance is unnecessary. P. González Testimony, day 13, p. 144. The plain words of the regulation require that such equipment be calibrated.

### 7. Audit Requirement

■ Title 21 C.F.R. § 820.20(b) requires that audit procedures be set forth in writing, and that audit results be written as well. Plastic Materials could not produce either written audit procedures or current audit results to the FDA investigator during the February–April 1990 inspection, *see* Exhibit 44, arguing only that claimant disagreed with the requirement.

Given the numerous and broad-ranging GMP violations that the government established, and since any single deviation from GMP will support a finding of adulteration under 21 U.S.C. § 351(h) (*see* 21 C.F.R. § 820.1(a)), our conclusion is that the defendant articles of device are adulterated within the meaning of the Act, and must be condemned and forfeited. 21 U.S.C. § 334(a)(2)(D).

### D. *Filth Violations*

As explained in Section I of this Opinion, the Court may condemn all of the seized articles solely because of the GMP violations, pursuant to 21 U.S.C. §§ 351(h) and 334. The filth violations form a separate and independent basis for condemnation for certain of the seized articles.

#### 1. Certain of the seized articles (cornstarch) violate 21 U.S.C. § 351(a)(1)

■ The cornstarch stored at claimant's Luquillo warehouse is adulterated within the meaning of 21 U.S.C. § 351(a)(1), because it consists in whole or in part of rodent filth. Mr. Brickey and Mr. Palau testified that there was absolute evidence—photographic and laboratory analysis—of rodent filth in the cornstarch. Such filth included rodent hair, rodent urine, and rodent gnawed paper inside the product. Brickey Testimony, day 4, p. 21; Palau Testimony, day 3, p. 10 through 16, Exhibits 47, 48, 49, 50. Claimant did not dispute these findings; rather, it objected that the government did not test each and every

---

**5.** Claimants own photographic exhibits, O7 and N7, contradict the testimony of Ms. Rosario and Ms. González. Moreover, Ms. González' prohibition on lipstick to prevent staining the gloves obviously anticipated that the gloves would come into contact with the employee's mouths. M. González Testimony, day 9, p. 42.

bag of cornstarch. Such an argument is without any basis in the law.

The statute prohibits all filth in devices. In light of the absolute statutory prohibition, there is simply no reason for the government to test unbroken bags of the component cornstarch when there is clear, visible contamination of filth in the lot in any amount. *See United States v. Cassaro*, 443 F.2d 153, 157 (1st Cir.1971); *see also A.O. Andersen & Co. v. United States*, 284 F. 542 (9th Cir.1922).

Claimant attempted to argue that, because there may be regulatory tolerance for certain types of unavoidable contaminants in foods, the same type of allowable tolerance should be permitted for devices. The Act, however, states otherwise: Congress clearly gave the agency the authority to establish tolerance for unavoidable contaminants in foods. *See* 21 U.S.C. § 346. There is simply no comparable exemption even permitted—let alone implemented and established by the agency—for devices. *See* 21 U.S.C. § 351. Nor can it be seriously argued that rodent filth in a device component is unavoidable.

### 2. Certain articles, (cornstarch and gloves), violate 21 U.S.C. § 351(a)(2)(A)

■ The government also produced uncontroverted evidence that certain articles (cornstarch and gloves) violate 21 U.S.C. § 351(a)(2)(A), because they were held under conditions in which there was a reasonable possibility that they could be contaminated with filth. This section of the statute regulates manufacturing and storage conditions. It does not require any showing of actual product contamination.[6] The government produced the uncontroverted testimony of Mr. Brickey that both of Plastic Materials' buildings, the warehouse and the manufacturing facility, harbored rodents: both buildings had countless routes for rodent access; both contained cornstarch, a foodstuff for rodents; both contained the types of materials that rodents seek to build their nests; and both contained rodent tracks on pallets of product

as well as on the floor. Mr. Brickey testified that such evidence conclusively established the presence of rodents in both buildings. Brickey Testimony, day 4, p. 12–15, 18, 19, 21; Exhibits 14, 15, 16, 17, 23–41, 50. There can be no serious doubts about his expertise in making such determinations. *See United States v. King's Trading*, 724 F.2d 631, 633 (8th Cir.1983). In addition, the manufacturing facility had cornstarch dust blowing throughout the area in which the gloves were manufactured. Cox Testimony, day 1, p. 31, 35, 38, 39, and Exhibits 9–13.

Furthermore, claimant's attempt to argue that the rodents were not present during manufacturing is immaterial, for the storage conditions are regulated under this section of the statute, and the gloves and cornstarch held under such conditions were subject to rodent contamination whether manufacturing was ongoing or not. *See Cassaro*, 443 F.2d at 157; *Wiesenfeld Warehouse Co. v. United States*, 376 U.S. 86, 87, 90, 84 S.Ct. 559, 562, 11 L.Ed.2d 536 (1964); *Berger v. United States*, 200 F.2d 818, 823 (8th Cir.1952) (existence of insanitary conditions can be inferred back to date prior to FDA inspection); *United States v. 44 Cases*, 101 F.Supp. 658 (E.D.Ill.1951) (insanitary conditions presumed to exist prior to FDA inspection).

### III. INTENDED USE REQUIREMENT

■ Claimant has repeatedly argued that certain of the seized articles, the cornstarch and gloves in the warehouse, are not devices because claimant did not intend to use them as devices. Claimant misinterprets the concept of "intended use" under the Act, for the manufacturer's intent regarding a product is determined by the objective intent, that is, by all of the facts and circumstances surrounding the manufacture, distribution, and actual use of the product. *United States v. An Article, Consist. of 216 Carton, Bot.*, 409 F.2d 734, 739 (2d Cir.1969) (intent may be inferred from product's "label, accompanying labeling, promotional material, advertising,

---

**6.** The government's sampling process becomes even more irrelevant with respect to this viola-

tion, for the government need not prove any product contamination.

and any other relevant source"). The manufacturer's subjective intent is not dispositive. *See United States v. 25 Cases, More or Less,* 942 F.2d 1179, 1182 (7th Cir.1991) (FDA's interpretation of the "device" definition is given deference in a seizure action); *United States v. Toftness Radiation Detector,* 731 F.2d 1253, 1256 (7th Cir.), *cert. denied,* 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 186 (1984); *United States v. 22 Rectangular or Cylindrical Devices,* 714 F.Supp. 1159, 1165 (D.Utah 1989) (objective, not subjective, intent controls device definition).

The circumstances surrounding the manufacture, distribution, and actual use of Plastic Material's gloves present overwhelming evidence that claimant's gloves are intended for use as—and therefore are—devices within the meaning of the Act. 21 U.S.C. § 321(h). The evidence presented at trial established that Plastic Materials had a single customer—the United States Department of Defense. P. González Testimony, day 13, p. 120–121; Exhibits Y2, 2, A3, and T7. The Department of Defense purchased only surgeon's and dental examination gloves from Plastic Materials. Exhibits Y2, Z2, A3, and T7; P. González Testimony, day 13, p. 121. The only labeling and packaging material in evidence is for surgeon's and dental examination gloves. Exhibits 4 and 5 (labels). The only evidence of any sales of Plastic Material's gloves are sales to the Department of Defense for latex surgeon's and dental examination gloves. *See* Claimant's Exhibits 42, Z2, A3, and T7. Indeed, the cornstarch itself is a special type of cornstarch used only to make devices. P. González Testimony, day 11, p. 80.

Claimant attempts to argue that the gloves in its warehouse were "seconds" and "thirds". Even if true, this would not mean that such gloves are not devices, rather, such gloves are defective devices. Claimant's argument is further undercut by the government's uncontroverted evidence that claimant stored packaged, sterile surgeons gloves and dental examination gloves in the warehouse as well. Cox Testimony, day 1, p. 104–105. Finally, the fact that the firm had stored the gloves and rodent-infested cornstarch instead of disposing of such items, strongly undermines claimant's argument that it did not intend to use the gloves as devices. Mr. González' unsupported statements to the FDA investigators cannot counter the weight of such evidence. *See United States v. Storage Spaces Designated No.'s 8 and 49,* 777 F.2d 1363, 1366 n. 5 (9th Cir.1985), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1291, 94 L.Ed.2d 148 (1987) ("self-serving labels cannot be allowed to mask the vendor's true intent as indicated by the overall circumstances").

Furthermore, the claimant of a product regulated by FDA, such as Plastic Materials, cannot ignore the actual intended use of a product, as set forth above, and rely on an individual's subjective intent, to avoid the reach of the law. *See Nutrilab, Inc. v. Schweiker,* 713 F.2d 335, 337 (7th Cir.1983) ("manufacturer cannot avoid the reach of the FDA by claiming that a product which looks like a food and smells like a food is not a food because it was not intended for consumption," *citing, United States v. Technical Egg Prods., Inc.,* 171 F.Supp. 326, 328 (N.D.Ga.1959)). *See also, National Nutritional Foods Assoc. v. Mathews,* 557 F.2d 325, 333 (2d Cir.1977).

## IV. ALL OF THE SEIZED ARTICLES ARE SUBJECT TO SEIZURE

Claimant has also argued that, because plaintiff could not provide the lot numbers of the gloves seized, it could not establish that the gloves were manufactured in violation of the GMP regulations. This argument must fail for several reasons. First, Mr. González admitted that Plastic Materials used the same manufacturing process from 1988 to 1990—this testimony establishes that the lack of lot numbers is irrelevant, and that if any gloves were manufactured during the period between 1988 and 1990, all gloves manufactured during that period were manufactured in violation of the GMP regulations. P. González Testimony, day 13, p. 127. Claimant did not establish that it sold or otherwise disposed of any gloves between the date of the FDA inspection, in Febru-

ary—April 1990, and the seizure in June of 1990. Second, the government's evidence established that the labels on the bags of gloves, when present at all, could not be relied upon. Indeed, Mr. González admitted that he opened a carton of gloves while with FDA investigator Cox, in which the lot numbers on the carton differed from those on the gloves. P. González Testimony, day 12, p. 45–46; Exhibit 44 at p. 18. Third, Mr. Twardochleb testified that, because of the nature of the violations, for example, the lack of screens and lack of adequate documentation in the DHR and DMR, the violations were of an ongoing nature. Twardochleb Testimony, day 5, p. 53 through 56. Fourth, all the gloves were held under insanitary conditions, in violation of 21 U.S.C. § 351(a)(2)(A), and are subject to condemnation under that section of the Act, regardless of their manufacturing date.

█ Plastic Materials presented conflicting evidence at trial regarding whether the firm manufactured any gloves after March 3, 1990. *Cf.*, testimony of P. González, day 12, p. 59, and P. González testimony, day 13, p. 118. Even if claimant did resume manufacturing, however, it may be inferred that the violations observed in the FDA inspection continued absent a demonstration by claimant that such violations were corrected. *See United States v. Morton–Norwich Products, Inc.*, 461 F.Supp. 760, 767 (N.D.N.Y.1978); *Copanos and Sons, Inc. v. FDA*, 854 F.2d 510, 525 (D.C.Cir.1988). Mr. Twardochleb, who routinely reviews device firms' responses to notices of violations by FDA, testified that Plastic Materials did not make any such demonstration. Twardochleb testimony, day 4, p. 4, 10; day 5, p. 44, 72.

Claimant repeatedly argued that, based on prior contact with FDA investigators and information present in material provided to the firm by the FDA, it assumed that it was in compliance with the GMP regulations. Such an argument is clearly not a defense to adulteration allegations under the Act.

█ Even if FDA investigators had inspected the firm in the past and failed to note GMP deficiencies, that does not provide a defense in this action.[7] It is well-settled that due process does not require procedural prerequisites, such as notice of and an opportunity to correct violations or any showing of probable cause, prior to the commencement of an *in rem* seizure under the Act, 21 U.S.C. § 334. *See* this Court's Order of August 27, 1991; *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 598, 70 S.Ct. 870, 872, 94 L.Ed. 1088 (1950); *United States v. Alcon Laboratories*, 636 F.2d 876, 882 (1st Cir.), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3005, 69 L.Ed.2d 388 (1981); *see also*, 43 Fed.Reg. 31,508; 31,526 (1978) ("[t]he industry should understand, however, that this regulation has the force of law, and that violation of its provisions are a basis for seizure, injunction, and for prosecution"). *See also* Claimant's Exhibit G7, p. 16–9 ("FDA is under no legal obligation to warn firms or individuals that they or their products are in violation of the law before initiating formal regulatory action"); *see also United States v. Dotterweich*, 320 U.S. 277, 278–279, 64 S.Ct. 134, 135–136, 88 L.Ed. 48 (1943) (even in a criminal prosecution the Act does not require that defendant be given an opportunity to present his views as a prerequisite to prosecution).

█ Claimant does not obtain a waiver to distribute illegal products because the

---

**7.** The evidence is clear that Plastic Materials had no reason to "assume" that it was in compliance with the GMP regulations. FDA investigator Guadalupe, who visited Plastic Materials in the past, testified that he had not conducted a full GMP inspection at the firm. Guadalupe Testimony, day 7, p. 42. Furthermore, the FDA had notified claimant on a previous occasion that its DMR and DHR were inadequate. P. González Testimony, day 13, p. 130, 134–135.

Indeed, Mr. González was obviously aware of the agency's different purposes in visiting the firm, as demonstrated by his response to a question pertaining to the extent of a prior FDA inspection:

Q: When was the first time that Mr. Guadalupe went to the plant, that you recall?
A: For a shipment, or—
Q: For a visit, Mr. González, for a visit.
A: October 12, 1988.
P. González Testimony, day 11, p. 89–90.

government has not enforced the law against it previously. *See Donovan v. Daniel Marr & Son, Co.*, 763 F.2d 477, 484 (1st Cir.1985) (failure of agency to issue prior citations for violations of Occupational Safety and Health regulations not a defense to substantive allegations). In fact, should the government find that FDA or its agents failed to enforce the law previously, for whatever reason, the agency has a duty to correct this earlier position. *See United States v. 60 28 Capsule Bottles, More or Less*, 211 F.Supp. 207, 215 (D.N.J.1962), *aff'd*, 325 F.2d 513 (3d Cir.1963).

██ It is also clear that one cannot invoke estoppel to avoid the requirements of legislation, such as the Act, which was enacted to protect the public from products that do not comply with the law. *See Scott Paper Co. v. Marcalus Manufacturing Co.*, 326 U.S. 249, 257, 66 S.Ct. 101, 105, 90 L.Ed. 47 (1945); *United States v. Article of Drug ... Hormonin*, 498 F.Supp. 424, 435–437 (D.N.J.1980), *aff'd*, 672 F.2d 904 (3d Cir.1981); *Bentex Pharmaceuticals, Inc. v. Richardson*, 463 F.2d 363, 368 n. 17 (4th Cir.1972), *rev'd on other grounds*, 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); *AMP Inc. v. Gardner*, 275 F.Supp. 410, 412 n. 1 (S.D.N.Y.1967), *aff'd*, 389 F.2d 825 (2d Cir.), *cert. denied*, 393 U.S. 825, 89 S.Ct. 86, 21 L.Ed.2d 95 (1968). To stop the government from enforcing the GMP regulations because it failed to do so earlier would deprive the public of the protection that the law is designed to establish.

Claimant is, in effect, asking this Court to enjoin the FDA from enforcing the law. It is beyond dispute that the government may not be enjoined from enforcing the Act; such relief would merely permit illegal conduct to continue to the detriment of the public. *See generally, Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 601, 70 S.Ct. 870, 874, 94 L.Ed. 1088 (1950); *United States v. Alcon Laboratories, Inc.*, 636 F.2d 876, 881 (1st Cir.), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3005, 69 L.Ed.2d 388 (1981).

██ Finally, claimant has placed great reliance upon material that the FDA provided to it regarding GMP compliance, and construes that information to mean that claimant has complete discretion to implement or ignore the GMP regulations in any manner. Claimant ignores the fact that those publications state that they were provided for information and guidance only and are not to be interpreted as statements of agency policy, Exhibit G7 at p. iv. The GMP regulations, 21 C.F.R. § 820, in contrast, were promulgated by notice-and-comment rulemaking and are binding and have the force and effect of law. *Id.* at 23–24.

Informational materials, such as those relied upon by claimant, are simply not the law, nor do they create any legal obligations or rights. *See Office of Personnel Management v. Richmond*, 496 U.S. 414, 433, 110 S.Ct. 2465, 2476, 110 L.Ed.2d 387 (1990) (erroneous advice by government employee will not estop government from denying benefits not otherwise permitted by law); *Schweiker v. Hansen*, 450 U.S. 785, 789–790, 101 S.Ct. 1468, 1471–1472, 67 L.Ed.2d 685 (1981) (claims manual for social security administration employees without legal force and no binding effect on the agency); *Kugel v. United States*, 947 F.2d 1504, 1507 (D.C.Cir.1991) (intraoffice manuals directing employees in conducting investigations have no legal force); *Jacobo v. United States*, 853 F.2d 640, 641 (9th Cir.1988) (manual establishing standards is not a regulation and does not have the force of law); *Brock v. Cathedral Bluffs Shale Oil*, 796 F.2d 533, 538–539 (D.C.Cir.1986) (Department of Labor's enforcement policy and guidelines for independent contractors not binding on the agency); *American Mining Congress v. Marshall*, 671 F.2d 1251, 1262–1263 (10th Cir.1982) (policy statement provided to mine operators regarding Mine Safety and Health Administration's dust control regulations is not binding, substantive rule).

Claimant's argument that it did not receive pre-seizure notice or have an opportunity to correct its violations is not a defense to the charge of adulteration. Claimant's attempt to blur an embargo imposed by the Commonwealth of Puerto Rico with this *in rem* forfeiture action brought under the Act is likewise without merit, because

any dispute concerning the Commonwealth's embargo is not before this Court.

Claimant has also attempted to argue that the warrant in this case is nothing more than a "general warrant" running afoul of the Fourth Amendment, an apparent reference to that portion of the warrant directing the seizure of "all other articles of device . . . ." Claimant's argument is baseless.

 Courts have recognized that seizures of goods brought under the Act do not violate the Fourth Amendment. *United States v. Articles of Drug . . . WANS*, 526 F.Supp. 703, 706 (D.P.R.1981); *United States v. An Article of Food*, 477 F.Supp. 1185, 1191–1192 (S.D.N.Y.1979).

Moreover, even "an illegal seizure does not immunize the goods from forfeiture." *United States v. An Article of Device "Theramatic"*, 715 F.2d 1339, 1341 (9th Cir.1983), *cert. denied sub nom., Cloward v. United States*, 465 U.S. 1025, 104 S.Ct. 1281, 79 L.Ed.2d 685 (1984); *United States v. "Monkey"*, 725 F.2d 1007, 1012 (5th Cir. 1984) (impropriety of seizure does not prevent forfeiture where independent untainted evidence establishes probable cause); *Martin v. United States*, 277 F.2d 785, 786 (5th Cir.1960) (legality of search and seizure cannot be raised in a forfeiture action); *United States v. Carey*, 272 F.2d 492, 494–495 (5th Cir.1959) ("[t]his Court has held on various occasions that the illegality of a search and seizure does not affect a libel of information for forfeiture").

 Seizures brought under the Act are initiated in conformity with the rules of admiralty. 21 U.S.C. § 334(b); Fed.R.Civ. P., Rules for Certain Admiralty and Maritime Claims, Rule C(2) and (3). Rule C(2) requires only that a complaint describe with "reasonable particularity" the property that is the subject of the action. On its face, this rule contemplates a less than exact identification of the articles to be seized. Moreover, reasonableness of a description varies with the circumstances of a case. Obviously, when dealing with fungible goods, such as devices and their components, the inventory of those items may fluctuate. Hence, the rule does not anticipate an exact description of each item to be seized. Both finished latex gloves and the components used in their manufacture are precisely identified in the warrant. When viewed in its entirety, it is clear that the claimant's contention is without merit.

## V. CONCLUSION

The evidence shows that the seized articles are adulterated as alleged in the complaint for forfeiture. Accordingly, the articles must be condemned and forfeited to plaintiff pursuant to 21 U.S.C. § 334, and the Court hereby ORDERS that the articles be DESTROYED pursuant to 21 U.S.C. § 334. Judgment shall be entered accordingly.

IT IS SO ORDERED.